OPINION
{¶ 1} Defendant-appellant, Myzell M. Woodward, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, after a jury trial, of one count of murder in violation of R.C. 2903.02, with a firearm specification in violation of R.C. 2921.145. Because the judgment of the trial court is supported by sufficient evidence and the manifest weight of the evidence, and because the trial court committed no reversible error, we affirm.
 {¶ 2} Defendant's conviction arises out of an incident during the early morning hours of October 4, 2001. On that date, Michael Rispress encountered Shannon Wallace and James Brown at a bar called The Rising Sun. When the bar closed at 2:00 a.m., Rispress offered to drive Wallace to her car and agreed to drive Brown home. Rispress had been drinking all night and was intoxicated. As Rispress drove down Berkeley Road, he hit a white SUV parked along the street. Rispress did not stop, but he continued driving to his house, which was nearby on Rich Street. When he arrived home, he parked on the street in front of his house and got out of the car to assess the damage from the accident. Brown exited the car and started to walk away; Wallace remained inside the car.
 {¶ 3} The white SUV belonged to Demitra Givens, who resided at 411 Berkeley Road. Givens was asleep at the time of the accident, but defendant, known as "Scoop," Tequila Byrd, and Michael Stewart, known as "Cuz," were standing on the front porch of her home; they saw Rispress hit Givens' vehicle and drive away. Although defendant and Stewart resided in Detroit, they frequently stayed in Columbus and knew Rispress from the neighborhood. During a discussion as to whether Rispress hit Givens' car intentionally, Stewart produced a 9 mm handgun from his waistband and suggested he and defendant find Rispress. Stewart told defendant to get "ol' boy," meaning the AK-47 assault rifle defendant kept at 413 Berkeley.
 {¶ 4} Stewart met defendant at the back of 411 Berkeley; the two then walked together to Rich Street. They noticed Rispress checking the damage to his car about a half a block away. Stewart fired four shots in the direction of Rispress's car, and defendant fired several shots as he ran toward Rispress. After Rispress fell to the ground, defendant stood over him, shooting him several times. Thereafter, defendant shot into the car twice and then rejoined Stewart.
 {¶ 5} After the shooting, the two men returned to 411 Berkeley. Stewart told Givens, who was awakened by the sound of gunfire, that Rispress hit her SUV. He gave her the 9 mm handgun and asked her to get rid of it. Givens hid the gun in a child's book bag and later sold it to Shannon Knight. In the meantime, defendant returned the AK-47 to 413 Berkeley. Stewart and defendant then drove to Nicole Allen's house for the remainder of the night. The next day, Stewart asked Allen to rent a car for him. Later that evening, Stewart and defendant returned to 413 Berkeley to retrieve the AK-47. The two men then parted and agreed to meet in Detroit in a few days.
 {¶ 6} Police officers responding to the scene found Rispress lying dead in the street, bleeding profusely from several bullet wounds. Wallace had been shot in the left wrist. Thirty to 40 people were congregated in the area, a few of whom indicated they saw an African-American male run from the scene carrying an assault rifle. Police recovered four spent 9 mm semi-automatic shell casings and 18 spent AK-47 shell casings from the scene. Ballistics testing revealed the four 9 mm shell casings were fired from the gun Givens sold to Knight. Ballistics testing further revealed all 18 AK-47 shell casings were fired from the same AK-47 assault rifle. Neither the AK-47 nor any ammunition for such a weapon was recovered either from the scene of the shooting or from 411 or 413 Berkeley.
 {¶ 7} An autopsy revealed Rispress sustained 18 gunshot wounds, with his death resulting from wounds to the head, chest, and back. Six of the bullet fragments recovered from Rispress's body were damaged to the point they were not suitable for comparison. However, one fragment recovered from Rispress's head was consistent with having been fired from an AK-47.
 {¶ 8} Pursuant to an indictment filed November 15, 2001, defendant was charged with one count of aggravated murder in violation of R.C. 2903.01, with a death penalty specification, and two counts of felonious assault in violation of R.C. 2903.11. All three counts included firearm specifications in violation of both R.C. 2941.144 and 2941.145. The R.C. 2941.144 firearm specifications were subsequently dismissed at trial.
 {¶ 9} Defendant was found not guilty of aggravated murder, but guilty of the lesser included offense of murder, including the R.C. 2941.145 firearm specification. Defendant was acquitted of both felonious assault charges. The trial court sentenced defendant to 15 years to life on the murder count, with an additional three years on the firearm specification. Defendant appeals, assigning the following five errors:
I. The trier of fact's decision was not supported by the evidence presented at trial and thus inequitable as against the manifest weight of the evidence, as well as insufficient to sustain a conviction of murder beyond a reasonable doubt.
II. The trial court committed reversible error when it failed to grant the defendant-appellant's motion for mistrial after state's rebuttal witness's testimony testified that the defendant-appellant confessed.
III. Prosecutorial misconduct by the State of Ohio in failing to provide discovery prior to trial should have been grounds for a mistrial and the trial court abused its discretion in not granting defendant-appellants [sic] motion for mistrial on those grounds.
IV. The trial court erred to the prejudice of the defendant-appellant in overruling appellant's motion for acquittal under criminal rule 29(a) since the state failed to satisfy its burden of proof on the charges.
V. The trial court abused its discretion in an aggravated murder prosecution by permitting the state to introduce photograph's [sic] of the victim's body in that the prejudicial impact upon the defendant-appellant outweighed the probative value of the introduction of said photographs at trial.
 {¶ 10} In his first assignment of error, defendant challenges the sufficiency of the evidence supporting his conviction and further contends his conviction is against the manifest weight of the evidence. Defendant's fourth assignment of error challenges the trial court's overruling his Crim.R. 29 motion for acquittal. As virtually identical standards of review apply to defendant's arguments regarding sufficiency of the evidence and Crim.R. 29, we will address both assignments of error together.
 {¶ 11} Crim.R. 29(A) provides a trial court shall enter a judgment of acquittal if the evidence is insufficient to sustain a conviction of the charged offense. A trial court may not enter a judgment of acquittal if the record demonstrates that reasonable minds could reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt. State v. Wolfe (1988), 51 Ohio App.3d 215,216. In making this determination, the evidence must be construed in a light most favorable to the state. Id.
 {¶ 12} "Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict * * *." State v. Smith (1997),80 Ohio St.3d 89, 113, certiorari denied, 523 U.S. 1125, 118 S.Ct. 1811, following State v. Thompkins (1997), 78 Ohio St.3d 380, 386. "When reviewing a claim of insufficient evidence, the relevant inquiry is whether any rational factfinder, after viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Clemons (1998), 82 Ohio St.3d 438, 444, certiorari denied, 525 U.S. 1277, 119 S.Ct. 816, followingJackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781,2789, and State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact." Clemons, supra.
 {¶ 13} To sustain defendant's murder conviction, the state must prove defendant purposely caused the death of Rispress. R.C.2903.02(A). Here, the only element of the offense defendant contests is his identity as the shooter.
 {¶ 14} Stewart testified that after he and defendant saw Rispress hit Givens' vehicle and drive away, defendant retrieved an AK-47 assault rifle he kept at 413 Berkeley. Along with Stewart, then armed with a 9 mm handgun, defendant walked toward Rispress, who stood beside his car on Rich Street. Stewart further testified that after Stewart fired four rounds in Rispress's direction, defendant ran toward Rispress, firing several rounds; after Rispress fell to the ground, defendant stood over him, shooting him several times.
 {¶ 15} At trial, the defense presented alternative theories that defendant could not have committed the murder because he was in Detroit at the time, and, even if defendant was present at the scene of the shooting, Stewart, not defendant, actually shot Rispress. Both of these theories primarily involve issues of witness credibility.
 {¶ 16} "[I]n a review of sufficiency of the evidence, the court does not engage in a determination of the witnesses' credibility." State v. Goff (1998), 82 Ohio St.3d 123, 139, certiorari denied, 527 U.S. 1039, 119 S.Ct. 2402. Instead, we essentially assume the state's witnesses testified truthfully and determine if that testimony satisfies each element of the crime. See State v. Gore (1999), 131 Ohio App.3d 197, 200-201. Here, viewing Stewart's testimony in favor of the state, the jury reasonably could find defendant was the shooter.
 {¶ 17} The foregoing discussion of credibility leads us to defendant's manifest weight of the evidence argument. "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the manifest weight of the evidence." Thompkins, at 387. In reversing the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. Whether a criminal conviction is against the manifest weight of the evidence "requires an examination of the entire record and a determination of whether the evidence produced attains the high degree of probative force and certainty required of a criminal conviction." State v.Getsy (1998), 84 Ohio St.3d 180, 193, certiorari denied,527 U.S. 1042, 119 S.Ct. 2407. "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Thompkins, at 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 18} Generally, however, the weight to be afforded the evidence and the credibility of the witnesses are issues to be determined by the jury as trier of fact. See State v. Dye
(1998), 82 Ohio St.3d 323, 329. As such, the jury is free to believe all, part, or none of the testimony of each witness who appears before it. State v. Long (1998), 127 Ohio App.3d 328,335. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony.State v. Wright, Franklin App. No. 03AP-470, 2004-Ohio-677, at ¶ 11. Thus, a reviewing court may not second guess the jury on matters of weight and credibility. Id.
 {¶ 19} Defendant first challenges Stewart's credibility, asserting he was motivated to lie in exchange for a reduced sentence. At trial, Stewart testified he originally was charged with aggravated murder with death penalty and firearm specifications, as well as two counts of felonious assault with firearm specifications. He acknowledged that in exchange for testifying against defendant, he was permitted to plead guilty to one count of involuntary manslaughter with a firearm specification for which he received a sentence of nine years of incarceration.
 {¶ 20} The record does not support defendant's contention that Stewart's plea agreement included a stipulation Stewart would not receive the benefit of the plea arrangement if he failed to testify defendant committed the offense. Stewart repeatedly testified the plea agreement required only that he tell the truth and did not require him to testify that defendant was the shooter. Further, the plea agreement, State's Exhibit LL, contains no such stipulation. Rather, the plea agreement states that Stewart agreed to testify "in a truthful manner" in the prosecution of defendant, and that the agreement would be rescinded if Stewart provided false testimony. Stewart was thoroughly cross-examined on the details of the plea agreement, as well as his version of the events of October 4, 2001. The jury was well aware of the issues defendant now raises and apparently still chose to believe Stewart. Such is the province of the jury.
 {¶ 21} Similarly unsupported in the record is defendant's additional contention that Stewart admitted to killing Rispress in a written letter of apology to Rispress's family. No written letter of apology appears in the record. We assume defendant is referring to a statement Stewart made to Rispress's family at his plea hearing indicating he was sorry and did not intend to kill Rispress. At trial, Stewart testified he could not recall making the statement, but if he did, all he meant was that he was sorry Rispress had been killed. In finding defendant guilty, the jury apparently rejected defendant's suggestion that Stewart's oral statement made at his plea hearing must be construed as an admission that he killed Rispress.
 {¶ 22} Defendant further challenges the credibility of Dimitra Givens' testimony. Givens testified she and defendant lived together at 411 Berkeley and engaged in a sexual relationship for approximately four months prior to the shooting. Defendant argues her testimony is incredible because no physical evidence linked defendant to 411 Berkeley. Defendant further argues Givens' testimony is wholly unreliable because she admitted she sold drugs out of her residence and lied to the police on the morning of the shooting.
 {¶ 23} We first note other testimony corroborated Givens' statement that defendant lived at 411 Berkeley. Byrd testified she saw defendant at that address every day for at least a month preceding the shooting. Further, the fact that no physical evidence was found at that location does not compromise the jury's verdict, as the crime was committed outside 411 Berkeley.
 {¶ 24} Defendant's argument regarding Givens' general untrustworthiness also is unpersuasive. Givens explained she initially lied to the police because the situation frightened her. Further, while Givens' admitted untruthfulness and involvement in the sale of drugs may make her less than an ideal witness, her credibility was for the jury to resolve.
 {¶ 25} Finally, defendant contends the jury's verdict is unreliable because the evidence at trial included two reports, Defense Exhibits H and I. Issued by the police in mid-October 2001, the reports described the suspect, identified only as "Scoop," as approximately 5'8" and 160 pounds, which is significantly smaller than defendant. In our view, this evidence does not render the jury's verdict unreliable. No testimony or other evidence indicated where the descriptions originated or how the reports were created. Accordingly, the jury could reasonably attach little significance to the information contained in the reports.
 {¶ 26} In short, the jury in this case had the opportunity to assess the credibility of the witnesses and weigh all the evidence admitted at trial. An appellate court may not substitute its judgment for that of the jury on issues involving the weight of the evidence unless it is manifestly clear that the jury lost its way in arriving at its verdict. State v. Williams,
Montgomery App. No. 20039, 2004-Ohio-1939, at ¶ 14. Based upon the record before us, we cannot so conclude. To the contrary, the weight of the evidence supports defendant's murder conviction. Accordingly, defendant's first and fourth assignments of error are overruled.
 {¶ 27} Defendant's second and third assignments of error contend the trial court erred in denying his motions for mistrial. "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected * * *." State v. Reynolds (1988),49 Ohio App.3d 27, 33. A mistrial is necessary only when justice so requires and a fair trial is no longer possible. State v.Franklin (1991), 62 Ohio St.3d 118, 127, certiorari denied,504 U.S. 460, 112 S.Ct. 2315.
 {¶ 28} The trial court has discretion to grant or deny a motion for mistrial. State v. Sage (1987), 31 Ohio St.3d 173,182. A reviewing court must defer to the judgment of the trial court, as it is in the best position to determine whether the circumstances warrant the declaration of a mistrial. State v.Glover (1988), 35 Ohio St.3d 18, 19. Accordingly, an appellate court will not disturb a trial court's decision granting or denying a motion for mistrial unless it constitutes an abuse of discretion. State v. Treesh (2001), 90 Ohio St.3d 460, 480, certiorari denied, 533 U.S. 904, 121 S.Ct. 2247. An abuse of discretion means more than an error of law or judgment; it implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 29} Defendant's second assignment of error contends the trial court should have ordered a mistrial after the prosecution engaged in misconduct by eliciting prejudicial testimony from the state's rebuttal witness.
 {¶ 30} Two of defendant's friends testified on his behalf. Both averred they saw defendant in Detroit every two or three days from July through October 2001, although neither could recall specifically whether they saw him in Detroit on October 3 or 4. To rebut the inference defendant may have been in Detroit when Rispress was shot, the prosecution called June Givens, Dimitra's mother, who testified defendant visited her home in Columbus on October 5, 2001. When the prosecution subsequently inquired regarding the substance of an alleged conversation between June Givens and defendant during that visit, defendant objected, contending the question was beyond the scope of defendant's case. After an unrecorded sidebar conference, the trial court overruled the objection. June Givens then testified, over further objection, that defendant asked her if she had seen the news and then stated that he "got that mother-fucker." (Tr. Vol. VII, 411.)
 {¶ 31} Defendant moved for a mistrial "with prejudice" on grounds of prosecutorial misconduct, arguing the prosecution knowingly elicited testimony from June Givens as to defendant's alleged confession in order to goad defendant into requesting a mistrial. Defendant further argued his alleged admission to June Givens had never been provided in discovery. The trial court admonished the prosecution for eliciting the challenged testimony without first alerting the court to its substance during the previous sidebar conference. The court further reproached the prosecution for failing to provide the challenged testimony in discovery and for failing to elicit the testimony in its case-in-chief.
 {¶ 32} In response, the prosecution admitted knowing that June Givens would testify to defendant's alleged confession and that the specifics of her testimony had not been provided to defendant. The prosecution, however, offered several reasons why a mistrial was not warranted: (1) a copy of the prosecution's taped interview with Stewart, wherein he discussed defendant's alleged confession to June Givens, was provided to defendant prior to trial; (2) June Givens was included on the state's list of potential witnesses; and (3) defendant had been provided the opportunity to interview June Givens. Defendant admitted he had been provided a copy of the taped interview with Stewart prior to trial and had reviewed the tape and thereafter interviewed June Givens. Defendant argued, however, that June Givens said nothing about defendant's alleged confession during that interview.
 {¶ 33} After extended discussions with counsel for both parties, the trial court determined it would reserve ruling on the motion until after the jury returned a verdict. In the meantime, the court, after considering several alternatives, sustained the objection and instructed the jury to disregard June Givens' testimony in its entirety. Following the jury's verdict, the trial court denied the motion for mistrial.
 {¶ 34} The trial court did not abuse its discretion in denying defendant's motion for mistrial. As noted, June Givens' name was provided on the original witness list, defendant received a copy of Stewart's tape recorded statement, and defendant interviewed June Givens prior to trial. Thus, defendant had access to all relevant information.
 {¶ 35} Even if the foregoing were insufficient to support the trial court's decision to deny the requested mistrial, those factors, coupled with the trial court's instructions, are sufficient. Specifically, the trial court sustained defense counsel's objection and explained to the jury that "the testimony of June Givens has been stricken, and you are instructed not to consider her testimony at all, and must treat it as though you never heard it." (Tr. Vol. VII, 463.) In its charge to the jury, the trial court reiterated that statements or answers stricken by the court or which the jury was instructed to disregard were not evidence and were to be treated by the jury as though it had never heard the testimony. In Ohio, a jury is presumed to follow a trial court's instruction to disregard testimony that has been stricken from the record. State v. Rowe (1993),92 Ohio App.3d 652, 672-673, jurisdictional motion overruled,69 Ohio St.3d 1403. The record does not indicate that the jury ignored the trial court's directive, and defendant has not demonstrated that the jury disregarded the instruction. Additionally, the record contains sufficient separate evidence to support defendant's conviction. Accordingly, we conclude the trial court did not abuse its discretion in denying defendant's motion for a mistrial. See State v. Tillman (1997), 119 Ohio App.3d 449,461. Therefore, defendant's second assignment of error is overruled.
 {¶ 36} By the third assignment of error, defendant contends the trial court should have ordered a mistrial after the prosecution engaged in misconduct by failing to provide discovery in a timely manner.
 {¶ 37} The state's second witness was Sergeant Travis Hollis, who was one of the police officers who responded to the crime scene. Following his direct testimony, defendant informed the trial court the prosecution had just provided the defense with an audiotaped discussion between Sergeant Hollis and the lead detective in the case, Althea Young. According to defendant, Sergeant Hollis told Detective Young that while the crime scene was being secured, a woman named Wendy Meyers informed him that a person named "Delton" or "D" shot Rispress.
 {¶ 38} In response, the prosecution argued Meyers did not actually identify "Delton" or "D" as the shooter, but only as a person she saw in the area of the shooting. In support of this argument, the prosecution referred to an audiotaped interview between Detective Young and Meyers in which Meyers stated that while she was in the area purchasing crack cocaine, she saw "D" standing outside an apartment building. A few minutes later, she heard gunshots and saw "D" running down an alley and into a nearby field. She described "D" as a dark-skinned African-American male, approximately 5'10" tall, with braided hair and dark clothing. According to the prosecution, Meyers further stated during the interview she did not know "D's" last name, did not know where he lived, and could not see whether or not he was carrying a gun.
 {¶ 39} Upon the trial court's questioning, the prosecution admitted defendant had not been provided either copies of the audiotapes or written summaries of the information contained in the audiotapes. Defendant argued the state had withheld exculpatory evidence and moved for a mistrial. Although defendant admitted the state included Meyers on its witness list, he indicated she could not be located.
 {¶ 40} Because the issue arose late Friday morning, the trial court decided to deny the motion for mistrial and recess court for the weekend to give defendant the opportunity to locate and interview Meyers. The court instructed the prosecution to provide defendant with any and all information in the state's possession concerning both Meyers and "D" so defendant could investigate on his own. The prosecution stated it would comply with the court's order by day's end and would instruct the police to locate Meyers, place her in custody, and make her available to defendant. Defendant agreed these measures were satisfactory.
 {¶ 41} When trial resumed the following Monday, defendant renewed his motion for mistrial with prejudice. In response, the prosecution argued defendant had been provided Meyer's name and address in discovery. The prosecution further asserted the audiotape of Meyer's interview did not include exculpatory material, as the police never considered "D" a suspect. In particular, the prosecution noted Meyers never claimed that she was at the scene or that "D" was involved in the crime. After considering the arguments of counsel, the trial court denied the motion for mistrial, concluding that despite the state's dilatory production of discovery, defendant failed to demonstrate actual prejudice.
 {¶ 42} Thereafter, defendant thoroughly cross-examined Sergeant Hollis regarding his conversation with Meyers. To that end, Hollis testified Meyers told him she observed a 5'6", 120-pound African-American male running from the crime scene, and Hollis reported the information to Detective Young. On redirect, Hollis testified Meyers is a known prostitute and drug user, never stated that she witnessed the crime, never stated how close she was to the crime scene, and stated she saw "D" running a full three blocks from the scene. On recross-examination, Hollis complied with defendant's request that he review the audiotape of his discussion with Young. Thereafter, Hollis denied he informed Young that Meyers said "D" committed the crime. Rather, he explained he told Young only that when he asked Meyers if she had actually witnessed the shooting, she "hem-hawed around" and said she knew "D" shot Rispress, but did not see him do it. (Tr. Vol. II, 114.)
 {¶ 43} After several other witnesses testified, defendant informed the trial court the defense investigator had contacted Meyers, who indicated the person she saw running from the crime scene was now deceased. Meyers was never called to testify.
 {¶ 44} On appeal, defendant contends the state's failure to disclose the evidence favorable to defendant violates Brady v.Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194. "Suppression by the prosecution of evidence that is favorable to the accused and `material either to guilt or to punishment' is a violation of due process." State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128, at ¶ 27, certiorari denied, 537 U.S. 1057, 123 S.Ct. 632, quotingBrady, at 87. "Evidence suppressed by the prosecution is `material' within the meaning of Brady only if there exists a `reasonable probability' that the result of the trial would have been different had the evidence been disclosed to the defense." Id. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id., quotingKyles v. Whitley (1995), 514 U.S. 419, 434, 115 S.Ct. 1555.
 {¶ 45} Defendant became aware of Meyers' statement and its potential significance during the trial. "Strictly speaking,Brady is not violated when disclosure occurs during trial, even when disclosure surprises the defendant with previously undisclosed evidence." State v. Iacona (2001),93 Ohio St.3d 83, 100. Nonetheless, the Supreme Court recognized that federal cases have held disclosures may be so late during the trial as to violate due process: "It has, however, been held that the philosophical underpinnings of Brady support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial. Even where information may be exculpatory, `[n]o due process violation occurs as long as Brady material is disclosed to a defendant in time for its effective use at trial.'" Id., quoting United States v. Smith Grading Paving, Inc. (C.A. 4, 1985), 761 F.2d 527, 532.
 {¶ 46} Defendant does not allege that the timing of the disclosure negatively affected his ability to effectively use the information at trial. Even if defendant had raised such an allegation, no due process violation is evident. Here, the disclosure was made early in the proceedings, during the direct testimony of the state's second witness. Once the trial court was made aware of the audiotapes, it ordered the prosecution to immediately provide them to defendant. Further, the court attempted to quell defendant's concerns by recessing court early on Friday so defendant could locate and interview Meyers over the weekend. When the parties returned to court on Monday, the defense indicated it had been in contact with Meyers, and the trial court granted defendant leave to place her on his witness list. Meyers, however, was never called as a witness, presumably because Meyers did not provide any information of value to the defense.
 {¶ 47} As a result, the record fails to demonstrate the trial court abused its discretion in failing to grant defendant's motion for mistrial. Rather, the trial court acted reasonably in attempting to correct the problem; the evidence simply did not materialize as defendant hoped it would. Accordingly, we overrule defendant's third assignment of error.
 {¶ 48} In his fifth assignment of error, defendant challenges the trial court's admission of two crime scene photographs of Rispress's body, contending the photographs are irrelevant, served merely to inflame the passions of the jury, and prejudiced defendant.
 {¶ 49} The admission of photographs is left to the sound discretion of the trial court. Smith, at 108; State v. Maurer
(1984), 15 Ohio St.3d 239, 264. The Maurer court held that "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." Id. at paragraph seven of the syllabus. Unless the trial court clearly abuses its discretion, and the defendant has been materially prejudiced thereby, a reviewing court should not disturb the trial court's decision. State v.Issa (2001), 93 Ohio St.3d 49, 64.
 {¶ 50} The fact a photograph is gruesome is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels it would prove useful to the jury. State v.Woodards (1966), 6 Ohio St.2d 14, 25. In State v. Morales
(1987), 32 Ohio St.3d 252, certiorari denied, 484 U.S. 1047,108 S.Ct. 785, the Ohio Supreme Court determined that numerous gruesome photographs depicting a murder scene and the victim's body both before and during the coroner's examination were neither repetitive nor cumulative, and that the probative value of the photographs outweighed the danger of unfair prejudice to the defendant. Id. at 256. In State v. Landrum (1990),53 Ohio St.3d 107, the court reached the same conclusion with regard to a close-up photograph depicting the murder victim's slit throat. Id. at 121.
 {¶ 51} Here, the state sought admission of two photographs, State's Exhibits P-11 and P-14, during the testimony of two of the police officers who responded to the crime scene. State's Exhibit P-11 is a full-body shot of Rispress lying face down in a pool of blood on the pavement. The photograph depicts an open wound on the left side of his face. Exhibit P-14 is a closer view of Rispress's head and the pool of blood, but does not show the wound to his face. Exhibit P-14 also depicts a set of keys in Rispress's right hand and a gunshot wound to his right arm. The officers testified the photographs accurately depicted the crime scene.
 {¶ 52} Defendant objected on grounds the photographs were both duplicative and prejudicial due to their graphic nature. The trial court overruled the objection and admitted both photographs, concluding they were both relevant and not unduly gruesome.
 {¶ 53} The trial court did not abuse its discretion in admitting the photographs. The depiction of keys in Rispress's hand in State Exhibit P-14 corroborates testimony from Wallace, Brown and Stewart that Rispress was shot soon after he exited his car. Further, the two photographs depict different injuries. Both photographs demonstrate Rispress's injuries more clearly than the coroner's testimony and report alone. Although the photographs arguably could be described as gruesome, their probative value outweighs the danger of unfair prejudice to defendant. Accordingly, defendant's fifth assignment of error is overruled.
 {¶ 54} Having overruled each of defendant's five assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
Brown and Sadler, JJ., concur.