OPINION
{¶ 1} This is an appeal by defendant-appellant, Darnell A. Reeves, from a judgment of the Franklin County Court of Common Pleas, following a jury trial in which appellant was found guilty of one count of murder.
 {¶ 2} On July 29, 2004, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, with a firearm specification. The indictment arose out of the shooting death of Juan Seagle on July 20, 2004. The matter came for trial before a jury beginning on January 11, 2005.
 {¶ 3} At the time of the events at issue, Sarah Pack and her son Keshawn resided in an apartment located at 1451 West Rich Street, Columbus. On the evening of July 19, 2004, Bradley Bechtel, a friend of Pack, was staying at the apartment; two other friends of Pack, Crystal Wolfe and Paula Lonie, were also at the apartment on that date.
 {¶ 4} Pack testified that, on the following morning (July 20), appellant came over to the apartment and "tried to force his self in trying to get to Crystal," who was in the bedroom. (Tr. at 105.) Appellant struck Pack in the face, and they began fighting. Eventually, appellant forced his way to the bedroom, but Pack jumped on him. According to Pack, her "face was all busted up," and Seagle, who had been outside smoking, came into the apartment and threw appellant on the couch. (Tr. at 106.) Appellant accused Wolfe of taking "his stuff." (Tr. at 106.)
 {¶ 5} Seagle took appellant outside the apartment and pushed him against a door. Appellant stated that he was not leaving without Wolfe. The prior evening, Wolfe had brought a .38 caliber handgun with her to the apartment, and Pack last observed it on top of the refrigerator. During the altercation outside between appellant and Seagle, Seagle pulled the .38 caliber handgun on appellant, "asking him if he thought it was funny." (Tr. at 108.) Pack took the gun from Seagle, and put it back in the house. Appellant then ran to Wolfe's car and left the scene. Pack testified that Seagle, "just trying to be funny, I guess, jumped on the trunk of the car," but later jumped off and returned to the apartment, "kind of laughing about the matter." (Tr. at 109.)
 {¶ 6} Pack called the police to report that appellant had stolen Wolfe's car. While they were waiting for the police, Pack stated that Wolfe received phone calls from appellant and Chelsea Harris, "not really * * * threatening * * * Juan but more or less threatening * * * me and * * * my son." (Tr. at 109.)
 {¶ 7} Pack then gave the following testimony regarding the events that next transpired at the apartment:
Well, Crystal start[ed] crying on the phone. And she eventually worked her way back in my house. I didn't think nothing of it. We was just standing out there [by] the pay phone. Right here as my back was turned toward the pay phone, Juan and Bradley was down by the bottom of the steps, and that's when Darnell and Chelsea had ran up. And from the way that they had ran up the only way we could do is either go down the steps or up the steps. * * * I went up the steps. Juan and Bradley tried to go down the steps.
While I was running through the second floor hallway, I just could hear a bunch of gunshots. And I went in number 12 real quick. That's where my son was with the babysitter. And I closed the door behind me. And that's when I heard the gunshots. I told Lonie call the police again. And when I came up — and had run outside, that's when I seen the blood. I just saw the blood once I got outside. You know, he was falling and everything. * * *
(Tr. at 110-111.)
 {¶ 8} When Pack came back outside, she observed Seagle falling to the ground near another building in the apartment complex. Police officers arrived at the apartment complex shortly after the shooting.
 {¶ 9} On cross-examination, Pack acknowledged that, because she was running up the steps when the shots began, she did not observe who actually fired the shots that day. At the time of the incident, Pack "thought two people done the shooting because as fast as the — the noise[.]" (Tr. at 121.)
 {¶ 10} Bechtel, age 17, testified that, on the morning of July 20, 2004, he was lying in a bed at Pack's apartment when appellant arrived at the residence; Bechtel woke up and observed Seagle and appellant fighting. Appellant was bleeding when he left the apartment.
 {¶ 11} Approximately 20 minutes later, appellant returned to the apartment, and Bechtel ran down the stairs from Pack's apartment and hid in a cubbyhole near the stairs. He peeked out of the cubbyhole and observed "Juan up against the wall and [appellant] was shooting him." (Tr. at 54.) Seagle then ran through the apartment complex with appellant "running down * * * after him." (Tr. at 72.) Bechtel subsequently observed Seagle "in the grass on the sidewalk * * * face down." (Tr. at 59.) Appellant fled the apartment complex, and Bechtel called 911 for medical assistance.
 {¶ 12} Wolfe, appellant's girlfriend, was called as a witness by the state. Wolfe initially testified that she did not remember any of the events at Pack's apartment on the evening of July 19 or the morning of July 20, including a fight or shooting. According to Wolfe, she had no memory of those events because she was on the drug Ecstasy at the time.
 {¶ 13} During a recess, Wolfe reviewed a police interview tape in which she spoke with officers about the incident; Wolfe then resumed her testimony, and indicated that she "[d]idn't recall too much at all other than * * * being in the house with Sarah Pack and Bradley, and we was partying that day." (Tr. at 97.) Wolfe recalled hearing "gunshots outside at like 6:30, two of them." (Tr. at 98.) She also recalled "everybody just got scared and ran outside and left." (Tr. at 98.)
 {¶ 14} Dr. Patrick M. Fardal, a forensic pathologist, performed an autopsy on Seagle. Dr. Fardal's autopsy revealed that the victim sustained three gunshot wounds to the back, left abdomen, and left arm. The gunshot wound to the back was from "fairly close range," with the bullet entering the right side of the victim's back, traveling through the right lung, part of the aorta, the left lung, and then lodging in the left side of his body. (Tr. at 39.) Dr. Fardal opined that the cause of death was from the wound to the back.
 {¶ 15} At the time of trial, Jesse Jones, called as a witness by the state, was in jail on a "federal gun charge," but had not yet been sentenced. (Tr. at 146.) He had previously been convicted of two other gun charges, possession of cocaine, burglary and various traffic charges.
 {¶ 16} Jones testified that, in September of 2004, he contacted Pat Dorn of the Columbus Police Department about some information he felt "needed to be known." (Tr. at 149.) According to Jones, he obtained the information from appellant. Specifically, Jones and appellant shared a jail cell, and appellant told Jones he was in jail "[f]or killing dude he got into it with." (Tr. at 148.) Jones related that appellant "got into a fight with this dude between him and Sarah. And I guess him and Sarah got into it. And he came back and did the dude." (Tr. at 148.) During direct examination, Jones denied that anyone promised him anything in exchange for his testimony.
 {¶ 17} Columbus Police Officer William Snyder identified various items recovered from the crime scene, including three spent .25 caliber shell casings. A live round .32 caliber bullet was also recovered.
 {¶ 18} Columbus Police Criminalist Mark Hardy testified that the three spent casings recovered from the crime scene were fired from the same weapon. He stated that the weapon was most likely a .25 semi-automatic pistol.
 {¶ 19} Appellant did not present any witnesses at trial. Following deliberations, the jury returned a verdict finding appellant not guilty of aggravated murder, but guilty of the lesser offense of murder; the jury also found appellant guilty of the firearm specification. By entry filed January 24, 2005, the trial court sentenced appellant to a prison term of 15 years on the murder conviction, with an additional three-year consecutive term for the firearm specification.
 {¶ 20} On appeal, appellant sets forth the following two assignments of error for review:
[I.] THE FAILURE OF DEFENSE COUNSEL TO CROSS EXAMINE THE STATE'S "SNITCH" WITNESS IN A MEANINGFUL MANNER AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL AND DENIED APPELLANT A FAIR TRIAL.
[II.] THE JURY VERDICT OF GUILTY AS TO THE MURDER CHARGE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 21} Under the first assignment of error, appellant argues that his trial counsel failed to effectively cross-examine the state's "snitch" witness, Jesse Jones, resulting in an unfair trial. Appellant argues that his trial counsel should have questioned Jones, who was awaiting sentencing on a federal weapons charge, regarding any expectations of assistance or help in his pending federal case. Appellant further maintains that his counsel should have attacked Jones' credibility as to his lack of memory of any meaningful details of the confession or the incident.
 {¶ 22} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that his trial counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." State v.Corrai, Franklin App. No. 04AP-599, 2005-Ohio-1156, at ¶ 8. This standard involves a two-part test: "First, appellant must show that counsel's representation fell below an objective standard of reasonableness. Second, appellant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different when considering the totality of the evidence that was before the court." Id., citing Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052.
 {¶ 23} Under Ohio law, a licensed attorney is presumed competent, and "effective assistance of counsel does not equate with a winning defense strategy," nor do debatable trial tactics necessarily constitute a violation of defense counsel's duties. Corrai, at ¶ 8. Further, an appellant "must demonstrate, not merely speculate, that defense counsel's trial tactics prejudiced her." Id., citing State v. Bradley (1989),42 Ohio St.3d 136, 143.
 {¶ 24} Upon review of the record in the instant case, we are unable to conclude that defense counsel's failure to more vigorously cross-examine Jones constituted deficient performance. As noted under the facts, during direct examination by the state, Jones admitted he was currently in jail on a federal weapons charge, and that he had various other prior convictions. Jones also stated on direct that he was not promised anything in return for his testimony. On cross-examination, defense counsel briefly questioned Jones about contacting a police detective while in jail, and the date he spoke with the detective.
 {¶ 25} During closing argument, defense counsel discussed Jones' criminal background and his testimony as follows:
The other civilian testified was Jesse * * * Jones * * *. Again, you weigh his credibility and his testimony. But I recall he's in on federal charges right now, in prison on gun charges. His prior record of two prior gun charges, possession of cocaine, trafficking in drugs, and then he remembered an old burglary. And he recalls meeting my client at the county jail sometime last summer. He says he knew him from on the street. And they shared a cell together. And his testimony was * * * my client supposedly, he said, "He got into it with dude, didn't know who this dude was, and didn't ask him his name, and came back and shot him, shot the dude."
Now, I asked Mr. Jones whether or not he made this statement to Patrick Dorn, lead homicide detective on this case, on around September 19 of last fall 2004. And he said that sounds about right. Well, when was that statement made and what context? I know they were in the jail together. But was this right after my client got arrested? Was this the day before and he waited two months to call Detective Dorn? Did he hear other information from other inmates? We don't know the context of that or how he received that information.
Our position is Mr. Jones would not be reliable to you to tell you the time of day let alone testify in court on a murder case.
(Tr. at 181-182.)
 {¶ 26} Although appellant contends his trial counsel should have pursued a more vigorous cross-examination of this witness, counsel's decision to limit his cross-examination of Jones may have been part of a strategy to avoid eliciting any further testimony damaging to his client, and to focus instead on attacking Jones' credibility during closing argument. As reflected above, during closing, counsel challenged both the credibility of the witness as well as his ability to remember events. Furthermore, the strategic decision whether or not to cross-examine a witness is firmly committed to the judgment of trial counsel. State v. Campbell (2000), 90 Ohio St.3d 320, 339. See, also,State v. Linville, Franklin App. No. 04AP-917, 2005-Ohio-3150, at ¶ 31 ("[t]he extent and scope of cross-examination clearly falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel").
 {¶ 27} Having failed to demonstrate that his counsel's trial performance was deficient under the first prong of Strickland, appellant's first assignment of error is without merit and is overruled.
 {¶ 28} Under his second assignment of error, appellant challenges his murder conviction as against the manifest weight of the evidence.
 {¶ 29} In State v. Drayer, 159 Ohio App.3d 189, 2004-Ohio-6120, at ¶ 13, this court discussed the manifest weight standard as follows:
In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "13th juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541. The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The power to reverse on manifest weight of the evidence should be used only in exceptional circumstances when "`the evidence weighs heavily against the conviction.'" Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215,485 N.E.2d 717.
 {¶ 30} In the instant case, the jury found appellant guilty of murder, in violation of R.C. 2903.02(A), which provides: "No person shall purposely cause the death of another[.]"
 {¶ 31} As previously noted, the state's primary witnesses regarding the incident were Pack and Bechtel. Pack testified that, on the morning of July 20, 2004, appellant forced his way into Pack's apartment looking for Wolfe. Pack and appellant got into an altercation, and appellant struck Pack in the face. Seagle, who was outside at the time, entered Pack's apartment and threw appellant onto a couch. Seagle then took appellant outside the apartment and pushed him against a door, resulting in an altercation. Appellant subsequently got into Wolfe's vehicle and drove away.
 {¶ 32} Appellant returned approximately 20 minutes later with a female companion. As Pack was running up the stairs, she heard the sound of gunshots. At the time appellant returned to the apartment, Bechtel, who was with Seagle near the stairs, ran down and hid in a cubbyhole area near the stairwell. Bechtel, however, peeked out of the cubbyhole and saw "Juan up against the wall and [appellant] was shooting him." (Tr. at 54.)
 {¶ 33} In arguing that his conviction was against the manifest weight of the evidence, appellant notes that Pack heard, but did not see, the shooting. That fact is not dispositive, however, as the state's evidence also included the eyewitness testimony of Bechtel, who stated that he observed appellant shoot Seagle.
 {¶ 34} Appellant argues that Bechtel's testimony should be discounted because he was hiding in a cubbyhole area at the time shots were fired. We disagree, and conclude that the trier of fact could have reasonably believed Bechtel's testimony that he observed appellant shoot Seagle at close range. The evidence indicates that the cubbyhole was in an area located behind the stairway outside the apartment building. As noted by the state, a schematic drawing of the crime scene was introduced at trial, showing the cubbyhole area to be in the immediate vicinity of where Seagle was standing. The record also indicates that the jury visited the crime scene prior to trial, and, therefore, had the opportunity to view the area at issue.
 {¶ 35} Appellant also argues that the fact different caliber bullets were found indicates the use of two guns by two different individuals. As noted under the facts, the coroner recovered two .25 caliber bullets from the victim, and police officers found a live.32 caliber bullet near the scene. We agree with the state, however, that, even assuming appellant's female companion had a weapon and also fired shots during the incident, the jury could have reasonably concluded that appellant caused Seagle's death. Specifically, the coroner testified that the fatal wound was inflicted to the victim's back at close range, and Bechtel testified that he observed the victim "up against the wall and [appellant] was shooting him." (Tr. at 54.) After being shot, Seagle attempted to run through the apartment complex, with appellant chasing after him. Appellant subsequently fled the scene.
 {¶ 36} Here, the jury's verdict was consistent with the evidence. Further, the jury was free to accept or reject any or all of the witnesses' testimony and to assess their credibility. State v. Woodward,
Franklin App. No. 03AP-398, 2004-Ohio-4418, at ¶ 18. Upon review, we cannot conclude that the jury clearly lost its way or that a manifest miscarriage of justice occurred. Accordingly, appellant's second assignment of error is without merit and is overruled.
 {¶ 37} Based upon the foregoing, appellant's first and second assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
KLATT and McGRATH, JJ., concur.