OPINION
{¶ 1} Defendant-appellant, Lorenzo D. Pryor, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of felonious assault and kidnapping, each with firearm specifications pursuant to R.C. 2941.141 and 2941.145. Defendant assigns a single error:
The trial court erred when it entered judgment against the defendant when the evidence was insufficient to sustain a conviction.
 {¶ 2} Pursuant to an indictment filed December 31, 2001, defendant, along with Larry Philpot and Hilda Shepherd, was indicted on one count of kidnapping in violation of R.C. 2905.01, one count of attempted murder in violation of R.C. 2923.02 as it relates to R.C. 2903.02, and one count of felonious assault in violation of R.C. 2903.11, each with firearm specifications. Prior to trial, Shepherd entered a guilty plea to reduced charges. Defendant and Philpot were tried jointly in a jury trial beginning May 6, 2003. Although the jury found defendant not guilty of attempted murder, it rendered guilty verdicts on the kidnapping and felonious assault charges against defendant, as well as the firearm specifications accompanying those charges. The trial court sentenced defendant accordingly.
 {¶ 3} Defendant appeals, contending neither sufficient evidence, nor the weight of the evidence, support the jury's verdicts against him. Defendant does not focus on any particular element of the offenses with which he was charged, but rather defendant contends the inconsistencies in the testimony presented through the state's witnesses render the state's evidence incapable of supporting the jury's verdicts.
 {¶ 4} To the extent defendant challenges his conviction as not supported by sufficient evidence, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, 260, paragraph two of the syllabus;State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 5} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380,387 ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"); Conley, supra. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 6} Hilda Shepherd and Chenise Higgs were the state's two primary witnesses, and they addressed the events of November 2, 2001 giving rise to the charges against defendant. According to Shepherd, she and defendant lived at 415 Taylor Avenue, along with defendant's nephew, Larry Philpot. Behind them, in a van, lived Alvin Love. Shepherd and Love were friends, and Shepherd never had any trouble with Love.
 {¶ 7} When Shepherd came home on November 2, Philpot told her Love was supposed to harm her in some way. Shepherd went to the van to ask Love whether he would come to the house to "straighten things out." (Tr. 150.) On her way to the van, Shepherd carried a knife for protection, ostensibly because of the bad area in which she lived. Shepherd admitted she had been smoking crack that night with defendant.
 {¶ 8} When Shepherd arrived at the van, she noticed in the van an African-American woman she never before had seen. The woman and Love were smoking crack. Shepherd asked Love if he would come back to the house with her, and, as they walked back to her house, she informed Love of Philpot's statement that Love intended to harm her. When they arrived in the kitchen of her home, Shepherd call for Philpot to come to the place where she and Love were standing. At first Philpot said Love was not the person purportedly intent on harming Shepherd, but he then changed his mind and started swinging at Love.
 {¶ 9} Although Philpot kept punching Love, Shepherd did not believe Love at any time hit Philpot. Even though Love had been hit so much that his jaw looked like it would not close, Philpot continued to beat Love. In one instance, however, Love knocked out one of the windows in the kitchen.
 {¶ 10} Initially Shepherd was watching the beating, but then she began running through the house, yelling "Here come the police." (Tr. 157.) A break in the fighting followed. Shepherd attempted to have Love sit down, but Love would not. Meanwhile, Philpot walked around the kitchen; then he swung over Shepherd's head, and the beating resumed.
 {¶ 11} Shepherd opened the door to let Love out of the house, but either defendant or Philpot shut the door. At one point, Love put his hand on Shepherd's throat. According to Shepherd, "I guess he was trying to tell me, you know, tried to tell me like — trying to — `help me! help me!' "(Tr. 158.) When Philpot reported that Love had Shepherd by her throat, defendant punched him. Love was standing by the door when defendant pulled a shotgun and told Love, "if you go out that door, nigger, I'm going to kill you." (Tr. 160.) As Shepherd again looked in the kitchen, she saw love was on the floor, and defendant was on the floor next to him with his hands around Love's neck. Shepherd admits she also hit Love.
 {¶ 12} As the police approached the house, they saw an African-American male hanging out of the kitchen window. He had a large amount of blood across his face, and he appeared as if he had been assaulted. When the police arrived, defendant ran upstairs to put on a robe. Shepherd opened the door and saw the police had their guns drawn; she did not know what to do, was frightened, and shut the door. The police came in, took her outside and handcuffed her. Inside, the police found "blood all over, the floor, walls. * * * It looked like a lot of things had been knocked down, scattered across the floor, kind of a mess." (Tr. 77-78.) A shotgun was collected from the scene, shotgun shells were found inside the gun, and the gun was examined and found to be in good operating condition.
 {¶ 13} Juxtaposing Chenise Higgs' testimony with that of Shepherd, defendant contends the inconsistencies are too great to support the jury's verdicts. According to Higgs, Love was the uncle of her children. She and Love had been together on November 2, 2001, since about three or four that afternoon, and they were drinking and getting high on crack. At nighttime the same day, Shepherd came to the van and asked why Love was throwing rocks at her nephew; Love denied seeing her nephew. Shepherd asked for a "hit," and Love said he had no more. (Tr. 274.) Shepherd then asked him to go with her to a store that was about five minutes away.
 {¶ 14} A few minutes later, Higgs heard glass breaking. She got out of the van and looked down the alley to the store, but did not see Love. When she walked down the alley, she looked into the house where she saw two men and a white woman, all beating Love. She identified defendant as one of the two men involved in the fight, and stated both men had handguns. She, however, does not remember seeing any large gun.
 {¶ 15} Higgs yelled at Love, who asked for help and told her to call the police. The people in the house became aware of Higgs and said, "the bitch is going to call the police. Kill the bitch." (Tr. 275.) Higgs ran to a Laundromat and called 911, explaining that Love was being beaten. When the police arrived, Love was hanging out the kitchen window, his face "all jacked up." (Tr. 276.) The people in the house stated Love broke into the house and tried to rob them.
 {¶ 16} As defendant accurately notes, discrepancies exist between the testimony of Shepherd and Higgs. Shepherd minimized her own involvement in any beating, testifying as if she were more of an observer than a participant. By contrast, Higgs testified Shepherd was also beating Love. In addition, Shepherd testified defendant had a shotgun and used it to prevent Love from leaving the house during the fight. Higgs, on the other hand, testified one or both of the men had handguns and were using them to pistol whip Love. While the police who arrived at the scene found a shotgun, they found no handguns.
 {¶ 17} In addition, to further demonstrate Shepherd's lack of credibility, defendant notes that Shepherd's recorded interview with an officer of the Columbus Police Department on December 3, 2001, tells a somewhat different version of the events from Shepherd's testimony at trial, alluding to a problem she had with Love because he purportedly cheated her out of $10. Defendant further notes that, during the interview, Shepherd not only required prompting to recall that defendant had a shotgun, but then stated that defendant told Love to "`get out of here' — so there won't be a fight." (Tr. 228.) The transcript, however, is less than clear in identifying the person who uttered that statement.
 {¶ 18} Finally, defendant points to the testimony of Philpot, whose testimony differs substantially from the state's witnesses. Philpot testified that, on the day before the incident, Love told Philpot he was going to kill defendant. On the day of the incident, Philpot walked downstairs and saw Love unarmed in the kitchen of their house. When Philpot asked Love why he had come, Love attacked him and the fight began. According to Philpot, he gave Love four punches and eight smacks, the smacks being the cause for the blood on the walls of the kitchen of Shepherd's home that the police saw when they arrived.
 {¶ 19} In determining the sufficiency of the evidence, we construe the evidence in favor of the state. Here, Shepherd's testimony alone supports the jury's verdicts, as Shepherd testified to the beating Love sustained at the hands of defendant and Philpot, the restraint defendant exercised in preventing Love from leaving the house, and the loaded gun defendant used to enforce his restraint. Defendant's contentions to the contrary about the sufficiency of the evidence are unpersuasive.
 {¶ 20} While our review of the manifest weight of the evidence involves a limited weighing of the evidence, inconsistencies in the testimony generally do not render the verdict against the manifest weight of the evidence. State v.Thompson (1998), 127 Ohio App.3d 511, discretionary appeal not allowed, 83 Ohio St.3d 1451 (stating that "[a] reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder"); State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, citing State v. Nivens
(May 28, 1996), Franklin App. No. 95APA09-1236 (noting that "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence"). Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. State v. Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing State v. Caldwell (1992),79 Ohio App.3d 667.
 {¶ 21} Applying those principles here, we cannot conclude the inconsistencies in the testimony render that testimony so beyond belief that a reasonable juror could not accept it as true, for despite the discrepancies in the testimony offered through the various witnesses, Shepherd and Higgs to some extent corroborated each other's testimony. Even if the uncorroborated testimony be ignored, the remaining evidence supports defendant's convictions.State v. Harris (1991), 73 Ohio App.3d 57, 67.
 {¶ 22} Specifically, if the jury accepted as true those portions of Shepherd's and Higgs' testimony that corroborate each other, it could believe that Shepherd and two men, at least one of which was armed, were hitting Love to the point that he was severely beaten and left hanging out the window of Shepherd's home, where the police undisputedly found him bloodied when they arrived. The police removed Shepherd, defendant and Philpot from the home. Thus, premised on the corroborated portions of the testimony, the jury reasonably could find defendant guilty of the charged offenses.
 {¶ 23} Accordingly, defendant's single assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
Lazarus, P.J., and Bowman, J., concur.