OPINION
{¶ 1} Defendant-appellant, José H. Calderon, appeals from a judgment of the Franklin County Court of Common Pleas that, among other things, convicted him of murder. Because defendant's murder conviction is supported by sufficient evidence and is not against the manifest weight of the evidence, and because the trial court did not err in its jury charge, we affirm the judgment of the common pleas court.
 {¶ 2} By indictment, defendant was charged with one count of murder, a violation of R.C. 2903.02, and one count of tampering with evidence, a violation of R.C. 2921.12. According to the indictment, on or about January 17, 2005, defendant purposely caused the death of Abraham Conteh, and defendant altered, concealed, or destroyed a knife to impair its value or availability as evidence. Defendant pled not guilty to these charges.
 {¶ 3} A jury trial, which was conducted with the assistance of interpreters, was later held. At trial, defendant maintained that he acted in self-defense and that he should not be held culpable for Conteh's death. At the close of the state's case-in-chief, defendant moved for acquittal under Crim.R. 29 as to all charges. The trial court granted in part defendant's Crim.R. 29 motion and dismissed the charge of tampering with evidence. However, the trial court denied defendant's Crim.R. 29 motion as to the murder charge.
 {¶ 4} After deliberating, a jury returned a verdict of guilty as to the charge of murder. Claiming that (1) defendant was not afforded a fair trial due to prosecutorial misconduct, (2) the jury's verdict was not supported by sufficient evidence, and (3) the jury's verdict was against the manifest weight of the evidence, defendant later moved for a new trial under Crim.R. 33. The trial court denied defendant's Crim.R. 33 motion. Thereafter, the trial court entered judgment and imposed a sentence of 15 years to life.
 {¶ 5} From the trial court's judgment, defendant appeals and assigns three errors for our consideration:
 1. The conviction for murder was against the manifest weight of the evidence.
 2. The conviction for murder was not supported by legally sufficient evidence.
 3. The trial court erred in charging the jury on the duty to retreat when the evidence clearly demonstrated that Jose Calderon attempted to leave and was prevented from doing so by Abraham Conteh.[1]
 {¶ 6} Because defendant's first and second assignments of error are interrelated, we shall jointly consider them.
 {¶ 7} When an appellant challenges his or her conviction as not supported by sufficient evidence, an appellate court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds in State v. Smith (1997),80 Ohio St.3d 89; State v. Thompkins (1997), 78 Ohio St.3d 380, 386, reconsideration denied, 79 Ohio St.3d 1451; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. In a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility, rather "we essentially assume the state's witnesses testified truthfully and determine if that testimony satisfies each element of the crime." State v. Woodward, Franklin App. No. 03AP-398,2004-Ohio-4418, at ¶ 16, cause dismissed, 103 Ohio St.3d 1489,2004-Ohio-5606, reconsideration denied, 104 Ohio St.3d 1428,2004-Ohio-6585.
 {¶ 8} Comparatively, when presented with a manifest-weight argument, an appellate court engages in a limited weighing of the evidence to determine whether the fact finder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. Thompkins, at 387; Conley, supra; State v.Group, 98 Ohio St.3d 248, 2002-Ohio-7247, at ¶ 77. In Group, the Supreme Court of Ohio stated:
 * * * The question for the reviewing court [in a manifest-weight claim] is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction."
Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. See, also,Thompkins, at 387.
 {¶ 9} R.C. 2903.02 provides in part:
 (A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.
 (D) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code.
 {¶ 10} R.C. 2901.22(A) provides:
 A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.
 {¶ 11} Accordingly, to sustain defendant's murder conviction in this case, the state had the burden of proving beyond a reasonable doubt that defendant specifically intended to cause the death of Conteh. R.C.2903.02(A) and 2901.05(A); see, also, State v. Davis (1982),8 Ohio App.3d 205, 209 (stating that "[e]vidence concerning self-defense may not be relevant until the state proves the statutory elements of the crime"); State v. Hancock, 108 Ohio St.3d 57, 2006-Ohio-160, at ¶ 36-38, reconsideration denied, 108 Ohio St.3d 1513, 2006-Ohio-1329 (concluding that sufficiency-of-the-evidence review under Jackson v. Virginia
[1979], 443 U.S. 307, 99 S.Ct. 2781, does not implicate the strength of defense evidence, such as affirmative defenses; rather, theJackson standard of review must be applied to the substantive elements of a criminal offense as defined by state law).
 {¶ 12} According to the state's evidence, Conteh and his wife owned and ran a store on Morse Road in Franklin County, Ohio, in which they sold clothing, purses, "hygienic and cleansing supplies," food, and calling cards. (Tr. 26-28, 39, 121.) This store was equipped with a video monitor and cameras (Tr. 32-33), and a security alarm system. (Tr. 35.) Conteh and his wife also kept a gun in the register drawer. (Tr. 36.) Defendant was familiar to Conteh and his wife because, in November 2004, defendant had made a business proposal to Conteh and his wife, which they later declined. (Tr. 36-38.)
 {¶ 13} During the early evening of January 17, 2005, Conteh, who at that time was outside his store and was partially covered in blood, was observed from a vehicle passing by. (Tr. 40-43, 54-55, 57.) Conteh, who attempted to walk but fell, was "flaring [sic] his hands," apparently attempting to draw the attention of others, and was approximately "midway between the parking lot from the front of the store to the curb." (Tr. 43, 45, 55, 57-58, 59.) A gun and blood were near the steps of the store. (Tr. 44, 46, 55.) Conteh also had a cell phone in his hand. (Tr. 47, 57-58, 63.)
 {¶ 14} The passersby initially drove past Conteh's location, but then returned. A passenger in the vehicle called 911 while the driver of the car approached Conteh. (Tr. 44, 55.) When the driver of the car approached Conteh, Conteh was having difficulty breathing (Tr. 48), and he tried to mumble as blood came from his mouth. However, because "[Conteh] had so much blood coming out of his mouth, he could hardly talk." (Tr. 49-50, 55, 57.)
 {¶ 15} The driver of the car asked Conteh whether he had been shot. (Tr. 50.) Conteh informed her that he had been stabbed, that the gun near the steps belonged to him, that he was a store owner, and that he had been robbed. (Tr. 50, 57.) Another passenger in the car also attempted to assist Conteh. (Tr. 57-58.) Eventually police and emergency medical staff arrived at the scene, and the emergency medical staff quickly left with Conteh. (Tr. 51-52.)
 {¶ 16} At about this same time, other emergency medical staff responded to a call at an apartment complex that was near the location of Conteh's store. (Tr. 67-68, 80.) While emergency medical personnel traveled to the apartment complex, they heard a call over the radio concerning a shooting near Cleveland Avenue and Morse Road, which was near the apartment complex. (Tr. 67, 80.) When emergency medical personnel arrived at the apartment complex, defendant, who initially identified himself as "Pedro," approached the emergency vehicle and informed emergency medical staff that he had been shot. (Tr. 68-69, 73, 74, 80, 81, 84.) Although there was blood on defendant's jacket, the majority of the blood was concentrated on defendant's left hand. (Tr. 70.) According to one of the emergency medical technicians, the amount of blood that was observed was of a quantity that typically would result "from a fairly substantial laceration or something like that." Id. After performing an assessment of defendant, "two small abrasions" or "two small lacerations" on defendant's left hand were discovered. (Tr. 71-72, 81.) These wounds were inconsistent with the quantity of blood that emergency medical personnel discovered. (Tr. 72, 81.) Emergency medical staff detected no gunshot wound or other trauma. (Tr. 82, 83.) When queried by emergency medical staff, defendant stated that he had been attacked at a nearby store (Tr. 73, 75), and defendant also later made a statement indicating that "it was a self-defense matter." (Tr. 85.)
 {¶ 17} Because defendant claimed to have been shot, emergency medical staff requested backup assistance. (Tr. 72, 82.) Finding that defendant was a suspect in the incident involving Conteh, police later arrested defendant. (Tr. 92.) According to a police officer who assisted in defendant's arrest, defendant stated "that he was in a store, and the guy attacked him. I asked him, you know, what store, what guy, and I don't recall what he said, but that was the general idea of it. He was in a store and somebody attacked him." (Tr. 91.)
 {¶ 18} Following defendant's arrest, police officers interviewed defendant without an interpreter. (Exhibit 10.) During this interview, defendant described his version of the events that occurred in the store and also told police about the whereabouts of a knife that defendant used to stab Conteh. (Tr. 124; Exhibit 10.) Police officers later executed a search warrant and searched defendant's residence. (Tr. 116-117.) While searching defendant's residence, police discovered a knife in a drawer in the location where defendant stated the knife would be found. (Tr. 116, 117, 124.) Police officers unsuccessfully attempted to obtain blood samples from the knife. (Tr. 118.)
 {¶ 19} At the store, police officers found, among other things, a catalogue for products that defendant had earlier attempted to sell to Conteh and his wife, and a second cell phone without its battery. (Tr. 36, 123.) Police officers also retrieved surveillance video from the store. (Tr. 105.)
 {¶ 20} Because the video surveillance system was a multicamera system, police officers made arrangements to have the store's surveillance video "clarified" so that it could be viewed in "real time," so that police officers "[could] actually watch individual cameras." (Tr. 105, 119, 138-139.) During the clarification process, images from the surveillance video were slowed down into "real time" (Tr. 141); however, nothing from the surveillance video was manipulated or changed. (Tr. 143.) As a result of this clarification process, another video was produced and was among the evidence presented at trial. (Exhibit 22.)
 {¶ 21} At trial, the state also presented testimony from the forensic pathologist who performed an autopsy of Conteh's body. According to this forensic pathologist, at the time of the autopsy, Conteh's body was 71 inches tall and weighed 261 pounds. (Tr. 151.) He concluded that Conteh "died solely and exclusively as a result of a sharp instrument wound to his back with an injury to his left lung and subsequent internal bleeding." (Tr. at 162.) After examining the knife that was recovered from defendant's home, the forensic pathologist also testified that the knife "would be perfectly compatible with the wound that we saw. * * * And like I say, there's other things that you have to do to say that is the one and only knife — sharp instrument that caused this defect, but this would be in a class that would be okay." (Tr. 163.)
 {¶ 22} Defendant contends that the state's evidence is legally insufficient to show beyond a reasonable doubt that defendant purposely caused the death of Conteh. We cannot agree.
 {¶ 23} "The element of purpose required by R.C. 2903.02 may be presumed where the natural and probable consequences of a wrongful act are to produce death." State v. Hoke (July 17, 2000), Knox App. No. 99-CA-19, motion for delayed appeal denied, 90 Ohio St.3d 1451, citingState v. Shue (1994), 97 Ohio App.3d 459, 466, dismissed, appeal not allowed (1995), 71 Ohio St.3d 1476, citing State v. Robinson (1954),161 Ohio St. 213, paragraph five of the syllabus. In State v. Butler (1967),11 Ohio St.2d 23, the Supreme Court of Ohio instructed:
 The accepted rule that a person must be held to intend the natural and probable consequences of his act evolved from cases dealing with the use of dangerous weapons and instrumentalities, such as guns, knives, clubs and other lethal objects. A person using such deadly and destructive objects is held, under the law, to intend the natural and probable consequences resulting from the manner in which such objects were used.
Id. at 34.
 {¶ 24} "Because the intent of an accused dwells in his or her mind and can never be proved by the direct testimony of a third person, it must be gathered from the surrounding facts and circumstances, and the General Assembly has provided that intent to kill may be proved by inference." State v. Hill, Cuyahoga App. No. 87645, 2006-Ohio-6425, at ¶ 14, citing State v. Treesh, 90 Ohio St.3d 460, 484-485, 2001-Ohio-4, certiorari denied, 533 U.S. 904, 121 S.Ct. 2247; see, also,Hoke, supra; In re Washington (1998), 81 Ohio St.3d 337, 340, reconsideration denied, 82 Ohio St.3d 1415; State v. Huffman (1936),131 Ohio St. 27, paragraph four of the syllabus; State v. Johnson (1978),56 Ohio St.2d 35, 38.
 {¶ 25} Because an intent to kill may be proved by inference,Hill, at ¶ 14, "[p]urpose or intent can be established by circumstantial evidence." Hoke, supra, citing State v. Nicely (1988),39 Ohio St.3d 147. "Circumstantial evidence is the `proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'" State v.Heny, Franklin App. No. 04AP-1061, 2005-Ohio-3931, at ¶ 33, appeal not allowed, 107 Ohio St.3d 1699, 2005-Ohio-6763, quoting State v.Bentz (1981), 2 Ohio App.3d 352, 355, fn. 6, citing 1 Ohio Jury Instructions (1968), Section 5.10(d). Moreover, "[circumstantial evidence has probative value equal to that of direct evidence."Henry, at ¶ 33, citing Nicely, supra, at 151." `[Individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'" Henry, at ¶ 33, quoting Bourjaily v.United States (1987), 483 U.S. 171, 179-180, 107 S.Ct. 2775.
 {¶ 26} Here, the evidence, including the videotaped evidence that was admitted into evidence and reasonable inferences drawn from the evidence, show that Conteh died from injuries related to a stabbing. Defendant admitted to stabbing Conteh with a knife that was later recovered from defendant's residence. After the stabbing, defendant returned to his residence, washed the knife, and placed the knife in a drawer. Defendant made no attempt to summon assistance for Conteh, even though defendant later sought medical treatment for his own injuries and initially provided emergency medical personnel with an assumed name.
 {¶ 27} The videotaped evidence and reasonable inferences drawn from this evidence further show that, prior to stabbing Conteh, defendant entered Conteh's store where he and Conteh conversed and later argued. Conteh retrieved a gun from behind the counter and placed the gun in his pocket; Conteh did not, however, brandish the gun in defendant's direction. Defendant exited the store and later re-entered the store. After re-entering the store, defendant threw plastic baskets toward Conteh. Defendant also picked up a folding chair in the store and used this chair against Conteh. At one point, while attempting to make a cell phone call, Conteh restrained defendant from leaving the store; however, while attempting to restrain defendant, Conteh did not brandish the gun that he earlier retrieved from behind the counter. Defendant and Conteh then physically struggled in the store. Defendant quickly exited the store while holding a knife.
 {¶ 28} Construing the state's evidence and reasonable inferences drawn from this evidence in favor of the prosecution, we conclude that a jury reasonably could conclude that defendant specifically intended to cause Conteh's death. Although Conteh retrieved a gun during the argument with defendant, Conteh did not brandish this weapon in a threatening manner during the encounter with defendant. After exiting the store, defendant, who carried a concealed knife and who at that time knew Conteh had a gun, returned to the store and escalated the argument by throwing plastic baskets at Conteh. After stabbing Conteh during an ensuing struggle, defendant returned to his residence. At his residence, defendant washed the knife and placed it in a drawer. Defendant made no attempt to summon assistance for Conteh; and defendant later used an assumed name when he sought treatment for himself. From this evidence, we find the jury reasonably could conclude that defendant acted purposely, as his specific intention was to cause Conteh's death. See, e.g., State v. Tibbets (2001), 92 Ohio St.3d 146, 161, certiorari denied (2002), 534 U.S. 1144, 122 S.Ct. 1100 (observing that defendant's use of an assumed name was probative of defendant's consciousness of guilt);State v. Williams (1997), 79 Ohio St.3d 1, 11, certiorari denied (1998),522 U.S. 1033, 118 S.Ct. 703, quoting State v. Eaton (1969),19 Ohio St.2d 145, 160, 196, 249 N.E.2d 897, vacated on other grounds (1972),408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750, quoting Wigmore, Evidence (3 Ed.) 111, Section 276 (stating that [i]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself"'").
 {¶ 29} Accordingly, defendant's contention that his murder conviction is supported by legally insufficient evidence is not well-taken.
 {¶ 30} "Under Ohio law, self-defense is an affirmative defense."State v. Williford (1990), 49 Ohio St.3d 247, 249, citing State v.Martin (1986), 21 Ohio St.3d 91, affirmed (1987), 480 U.S. 228,107 S.Ct. 1098, rehearing denied (1987), 481 U.S. 1024, 107 S.Ct. 1913. "The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." R.C. 2901.05(A).
 {¶ 31} In Williford, the Supreme Court of Ohio instructed:
 * * * To establish self-defense, the defendant must show "* * * (1 ) * * * [he] was not at fault in creating the situation giving rise to the affray; (2) * * * [he] has [sic] a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of * * * force; and (3) * * * [he] must not have violated any duty to retreat or avoid the danger. * * *" State v. Robbins (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of the syllabus. The defendant is privileged to use that force which is reasonably necessary to repel the attack. State v. McLeod (1948), 82 Ohio App. 155, 157, 37 O.O.3d 522, 522-23, 80 N.E.2d 699, 700. "If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." (Emphasis sic.) State v. Jackson (1986), 22 Ohio St.3d 281, 284, 22 OBR 452, 455, 490 N.E.2d 893, 897, certiorari denied (1987), 480 U.S. 917, 107 S.Ct. 1370, 94 L.Ed. 686.
Id. at 249. (Emphasis sic.)
 {¶ 32} At trial, defendant, who routinely carried a knife for protection, testified that, on the evening that Conteh was stabbed, he went to Conteh's store to pick up catalogs that he had provided to Conteh. (Tr. 180, 203.) According to defendant, although Abraham Conteh and his wife had declined to purchase products from him in November 2004, they later insisted that he return and give them catalogs. (Tr. 200.)
 {¶ 33} Defendant denied having any intention of causing harm to Conteh when he went to Conteh's store on the evening of January 17, 2005. (Tr. 180.) According to defendant, when defendant inquired of Conteh where his catalogs were, Conteh denied knowing their whereabouts. Id. Believing that Conteh was not being truthful, defendant asked Conteh why he was lying to him. (Tr. 180-181.) At some point, Conteh began to insult defendant, and Conteh accused defendant of "always being around in that area, hanging around the store." (Tr. 181-182.) Defendant testified that at one point Conteh "actually got really close, like right up in front of my face, you know, intimidating me very much." (Tr. 182.)
 {¶ 34} According to defendant, after defendant exited the store, Conteh continued to state that "he was afraid that I'd be walking around there because of his mother or his wife," and Conteh continued to insult defendant. (Tr. 182-183, 184.) Defendant denied seeing Conteh retrieve a weapon from behind the counter. (Tr. 183.) According to defendant, "simply I thought that he might be reaching right around where the magazine might have been or he was hiding or he had kept the catalogs, the magazines." Id. However, after Conteh retrieved the gun, defendant did see Conteh put the gun in his pants. Id. After Conteh put the gun in his pants, defendant attempted to call the police. Id.
 {¶ 35} Defendant later realized that he did not have his cell phone with him. (Tr. 184.) According to defendant, he dropped his cell phone and later Conteh unintentionally kicked the phone into the store. (Tr. 217-218.) After realizing that he did not have his cell phone, defendant re-entered the store because he wanted to retrieve his cell phone. (Tr. 184.) Defendant denied that his cell phone and battery fell out of his pocket during the physical struggle with Conteh. (Tr. 218-219.)
 {¶ 36} Defendant also denied having any intention to cause serious harm to Conteh when he re-entered the store. (Tr. 184-185.) Defendant admitted to throwing baskets at Conteh when he re-entered the store "because of the offenses he was stating — he was saying." (Tr. 185.) Although defendant admitted throwing the baskets at Conteh, defendant denied intending to cause any harm to Conteh; rather, according to defendant, "I was trying for him — I told him to please retract or to amend what he had just said because that had offended me profoundly." Id. According to defendant, he picked up a chair "[b]ecause I wanted to defend myself at that point and so I could have a chance to bend down and pick up my phone, and that's where I bent down to pick it up." (Tr. 185-186.)
 {¶ 37} Defendant testified that he next attempted to exit the store, but Conteh had locked the door. (Tr. 186.) Defendant saw that Conteh was attempting to make a call. Id. Defendant testified: "I was thinking maybe he was calling friends or a family member, perhaps." Id.
 {¶ 38} According to defendant, he wanted to leave the store because "I was in fear. I was experimenting [sic] a lot of fear, and this had come to a dangerous level." Id. Defendant testified that he was fearful "[o]f [Conteh's] firearm and that he just wanted to keep me there as a hostage or sequester me there and I wouldn't be able to leave. * * * I was in fear. I felt danger, yes, and that he wanted to — and that he wanted to kill me perhaps. That he wanted to sequester me there and keep me as a hostage perhaps." (Tr. 186-187.) Defendant further testified that Conteh was taller and heavier than him and defendant was concerned that "[Conteh] would overtake me. He would be more robust and would definitely take me down." (Tr. 187.) According to defendant, at one point, Conteh used all his of strength and force to throw him down. (Tr. 188.)
 {¶ 39} Defendant testified that during the struggle with Conteh he reached for his knife. (Tr. 192.) When questioned why he decided to reach for his knife, defendant testified: "Because this was — this was my shirt. I was protecting myself and my assurance that — * * * I was acting in self-defense." (Tr. 192-193.) Defendant admitted to stabbing Conteh once. (Tr. 193.) Defendant testified that when he stabbed Conteh, he did not intend to kill him. Id. On redirect examination, defendant testified that he used his knife as a "last resort" to free himself from Conteh's bear hug and that, although he intended to inflict a wound, he did not intend to kill Conteh. (Tr. 238-239.)
 {¶ 40} According to defendant, when he discovered that Conteh had died, defendant felt "[t]otally in shock, bad. Felt really, really horrible." (Tr. 193.) On direct examination, defense counsel inquired: "Looking at this whole incident in total, if you could describe the moment — what was the moment that you felt that Mr. Conteh wanted to kill you?" (Tr. 194.) In response, defendant testified: "When he attacked me there at the end and when he was pulling and pushing me more inside towards the establishment." Id.
 {¶ 41} However, in contrast to defendant's testimony, earlier at trial, Detective Wayne Goss, primary detective in the police investigation, testified, in part:
 By [Asst. Prosecuting Attorney McLean]:
 Q. Detective Goss, isn't it true that throughout the interview process, [defendant] never stated he thought [Conteh] was going to kill him; is that correct?
 A. Correct.
 Q. Did [defendant] ever state he was in fear of getting shot?
 A. Not to my knowledge. I don't recall.
 Q. And, in fact, I think you brought this up. Didn't [defendant] in fact say he was not afraid of the gun?
 A. Yes.
(Tr. 126-127.)
 {¶ 42} Defendant testified on direct examination that, when he arrived at his residence after leaving the store, he first picked up the phone and called police. (Tr. 188.) On cross-examination, defendant amplified his direct testimony. When asked what he told police when he called them, defendant testified: "They clearly told me that — they didn't let me explain what had happened. They didn't hear all my story. What they asked me at that point was did I need emergency help, if they could send out emergency help to assist me." (Tr. at 201.) Defendant also confirmed that, after he called police, he wiped off the knife, cleaned it up, and put it away. (Tr. 203.)
 {¶ 43} Defendant admitted that he did not inform emergency personnel about the stabbing of Conteh. (Tr. 201-202.) Defendant testified: "I mentioned what had happened to me, but I did not mention his complete or full name." (Tr. at 202.) Defendant further testified: "Yes, I knew I had stabbed him, but I didn't have enough time at that point. They didn't give me enough time to explain the whole story, the whole situation." Id. Defendant denied telling emergency personnel that he had been shot or that his name was "Pedro." (Tr. 201.)
 {¶ 44} On cross-examination, when asked why he did not leave the area after first exiting from the store, defendant testified: "Because [Conteh] kept asking me or, you know, telling me why was I hanging out or why did I walk, you know, in front of the store. And at that point I came to the conclusion that he just did not want — you know, definitely did not want to see me or see me around there." (Tr. 213-214.)
 {¶ 45} In a criminal or civil case, a determination of the weight of the evidence and credibility of witnesses is primarily for the trier of facts. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. In Woodward, supra, this court explained:
 * * * [T]he jury is free to believe all, part, or none of the testimony of each witness who appears before it. State v. Long (1998), 127 Ohio App.3d 328, 335. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. State v. Wright, Franklin App. No. 03AP-470, 2004-Ohio-677, at ¶ 11. Thus, a reviewing court may not second guess the jury on matters of weight and credibility. Id.
Id. at ¶ 18.
 {¶ 46} "While [appellate] review of the manifest weight of the evidence involves a limited weighing of the evidence, inconsistencies in the testimony generally do not render the verdict against the manifest weight of the evidence." State v. Pryor, Franklin App. No. 03AP-1041,2004-Ohio-4558, at ¶ 20; see, also, State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236, application for reopening denied,State v. Nivens (Dec. 3, 1996), Franklin App. No. 95APA09-1236, motion for delayed appeal denied (1998), 83 Ohio St.3d 1463 (observing that "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence"). "Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true." Pryor, at ¶ 20, citing State v. Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, motion for delayed appeal denied, 100 Ohio St.3d 1421, 2003-Ohio-5232, citing State v. Caldwell (1992), 79 Ohio App.3d 667, jurisdictional motion overruled, 65 Ohio St.3d 1435.
 {¶ 47} Here, there was conflicting evidence concerning whether defendant believed he was in imminent danger of death or great bodily harm. According to the testimony of Detective Goss, during the police interview, defendant never stated that he thought Conteh was going to kill him. However, at trial, defendant claimed to have had a belief at the time of the stabbing that he was in imminent danger of death or great bodily harm. Because the jury was free to believe all, part, or none of defendant's testimony, the jury properly could determine that defendant's testimony was less credible than that of Detective Goss, and, therefore, the jury also could properly conclude that defendant's claim that he was in imminent danger of death or great bodily harm seemingly was unconvincing. The jury therefore also reasonably could find that defendant failed to prove by a preponderance of the evidence that he acted in self-defense and could find beyond a reasonable doubt that defendant specifically intended to cause Conteh's death.
 {¶ 48} Consequently, for the foregoing reasons, we cannot conclude that in resolving evidentiary conflicts the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Therefore, defendant's contention that his murder conviction is against the manifest weight of the evidence is not well-taken.
 {¶ 49} For the reasons set forth above, defendant's first and second assignments of error are overruled.
 {¶ 50} Defendant's third assignment of error challenges the trial court's jury charge. Defendant asserts that the trial court should have, among other things, narrowed the jury charge "solely to the issue of whether or not Jose Calderon had reasonable grounds to believe and an honest belief that he was in immediate danger of great bodily harm and that his only means of withdrawal was by the use of deadly force." (Defendant's merit brief, at 13.) The state argues that error, if any, was invited error because defendant proffered the instruction regarding self-defense that the trial court used. Absent from the record, however, are any proposed jury instructions by defendant.
 {¶ 51} Crim.R. 30(A) provides in part:
 On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.[2]
 {¶ 52} Here, we cannot determine from the trial transcript when the jury precisely retired to consider its verdict. We therefore cannot determine whether under Crim.R. 30, defendant's trial counsel properly preserved the error that defendant's appellate counsel now assigns as error, or whether defendant's trial counsel failed to timely object, thereby waiving all but plain error.[3]
 {¶ 53} "A charge to the jury should be a plain, distinct and unambiguous statement of the law as applicable to the case made before the jury by the proof adduced." Marshall v. Gibson (1985),19 Ohio St.3d 10, 12, citing Parmlee v. Adolph (1875), 28 Ohio St. 10, paragraph two of the syllabus. Furthermore, "[a] charge ought not only be correct, but it should also be adapted to the case and so explicit as not to be misunderstood or misconstrued by the jury." Marshall, at 12, citingAetna Ins. Co. v. Reed (1878), 33 Ohio St. 283, 295.
 {¶ 54} "[T]here is a strong presumption in favor of the propriety of jury instructions. Instructions which, in their totality, are sufficiently clear to permit the jury to understand the relevant law shall not be the cause of a reversal upon appeal." Arthur Young Co. vKelly (1993), 88 Ohio App.3d 343, 350, cause dismissed,67 Ohio St.3d 1462, citing Schade v. Carnegie Body Co. (1982), 70 Ohio St.2d 207, 210; see, also, Burns v. Prudential Securities, Inc., 167 Ohio App.3d 809,2006-Ohio-3550, at ¶ 41.
 {¶ 55} "A jury charge must be considered as a whole and a reviewing court must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." Becker v. Lake Cty. Memorial Hosp. West (1990),53 Ohio St.3d 202, 208, citing Ohio Farmers Ins. Co. v. Cochran (1922),104 Ohio St. 427, paragraph six of the syllabus; Wagenheim v. Alexander Grant Co. (1983), 19 Ohio App.3d 7. "If, taken in their entirety, [jury] instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled. Moreover, misstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party." Toth v. Oberlin Clinic, Inc., Lorain App. No. 01CA007891, 2002-Ohio-2211, at ¶ 45, appeal not allowed, 96 Ohio St.3d 1495,2002-Ohio-4535, quoting Wozniak v. Wozniak (1993), 90 Ohio App.3d 400,410, cause dismissed, 68 Ohio St.3d 1440. (Citations omitted.) Whether jury instructions correctly state the law is a question of law that an appellate court reviews de novo. Burns, at ¶ 41, citing Murphy v.Carollton Mfg. Co. (1991), 61 Ohio St.3d 585, 591.
 {¶ 56} Here, evidence was presented at trial to support a claim of self-defense. See, generally, State v. Melchior (1978),56 Ohio St.2d 15, 20, quoting State v. Robinson (1976), 47 Ohio St.2d 103, 111-112
(stating that "in order for the defendant to successfully raise an affirmative defense `* * * evidence of a nature and quality sufficient to raise the issue must be introduced, from whatever source the evidence may come'"). Because evidence was presented at trial to support a claim of self-defense, whether defendant acted in self-defense was a factual matter for the jury to determine. See, e.g., State v. Abner (1978),55 Ohio St.2d 251, wherein the Supreme Court of Ohio stated:
 Once the affirmative defense of self-defense has been properly raised, the trier of fact must consider it and all the evidence in the case and if, after so doing, the trier entertains a reasonable doubt of the defendant's guilt he must be acquitted. On the other hand, if the trier of fact considers all of the evidence in the case, including the properly raised affirmative defense of self-defense, and entertains no reasonable doubt of the defendant's guilt, he must be convicted. * * *
Id. at 253-254.
 {¶ 57} To determine whether defendant acted in self-defense, the jury was therefore required to determine whether defendant supported his burden of proving by a preponderance of the evidence the elements of self-defense. See, generally, State v. Robbins (1979), 58 Ohio St.2d 74, at paragraph two of the syllabus, approving and followingMelchior, supra, as follows:
 To establish self-defense, the following elements must be shown: (1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger. * * *
 {¶ 58} In State v. Jackson (1986), 22 Ohio St.3d 281, certiorari denied (1987), 480 U.S. 917, 107 S.Ct. 1370, the Supreme Court of Ohio instructed:
 As made clear by this court in Robbins, supra, the elements of self-defense are cumulative. In order to prevail on the issue of self-defense, the accused must show that he was not at fault in starting the affray, and that he had a bona fide belief that he faced imminent danger of death or great bodily harm and that his only means of escape was the use of such force, and that he violated no duty to retreat or avoid the danger. If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense.
Id. at 284. See, also, State v. Peacock (1883), 40 Ohio St. 333
(establishing that no one has a duty to retreat if he is assaulted in his home); State v. Graham (1918), 98 Ohio St. 77, 79 (stating that no one has a duty to retreat if he is assaulted in his business);Jackson, supra, at 283 (construing Peacock and Graham) (stating that "[t]he Peacock and Graham cases state, respectively, that one has no duty to retreat if he is assaulted in his home or business").
 {¶ 59} After reviewing the jury instructions, we find that the trial court's jury charge was a plain, distinct, and unambiguous statement of the law as applicable to the actual issues in the case, including the issue of self-defense, as posited by the evidence and pleadings. See, generally, Jackson, at 284, quoting State v. Guster (1981),66 Ohio St.2d 266, 271 (stating that "`* * * a court's instructions to the jury should be addressed to the actual issues in the case as posited by the evidence and the pleadings"); Marshall, supra, at 12, citingParmlee, supra, at paragraph two of the syllabus. We further find that the trial court's jury instruction did not mislead the jury in a matter materially affecting defendant's substantial rights. Accordingly, defendant's contention that the trial court erred in its self-defense instruction is not well-taken. We, therefore, overrule defendant's third assignment of error.
 {¶ 60} For the foregoing reasons, all three of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
SADLER, P.J., and BRYANT, J., concur.
[1] At oral argument, defendant's counsel informed this court that defendant's third assignment of error as stated in defendant's appellate brief was incorrect. It asserted: "The total count used in charging the jury on the duty to retreat when the evidence clearly demonstrated that Jose Calderon attempted to leave and was prevented from doing so by Abraham Conteh." [sic] According to defendant's counsel, it should have asserted: "The trial court erred in charging the jury on the duty to retreat when the evidence clearly demonstrated that Jose Calderon attempted to leave and was prevented from doing so by Abraham Conteh."
[2] Crim.R. 30 was amended effective July 1, 2005, which was after defendant was charged by indictment, and before trial commenced. The portion of Crim.R. 30(A) cited above was unaffected by the 2005 amendments to Crim.R. 30.
[3] During oral argument, defendant's appellate counsel appears to concede that a plain error standard of review applies as to defendant's third assignment of error. Under a plain error standard of review, "[p]lain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise."State v. Moreland (1990), 50 Ohio St.3d 58, 62, rehearing denied,51 Ohio St.3d 704, certiorari denied, 498 U.S. 882, 111 S.Ct. 231; see, also, State v. Long (1978), 53 Ohio St.2d 91, at paragraphs two and three of the syllabus; Crim.R. 52(B) (providing that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court"); State v. Barnes (2002),94 Ohio St.3d 21, 27 (stating that "Crim.R. 52(B) states only that a reviewing court `may' notice plain forfeited errors; a court is not obliged to correct them.")