OPINION
{¶ 1} Defendant-appellant, Bruce J. Johnson, appeals from a judgment of the Franklin County Court of Common Pleas that convicted him of aggravated murder and murder. For the following reasons, we affirm the trial court's judgment.
 {¶ 2} According to the state, on September 14, 2004, defendant purposely, and with prior calculation and design, stabbed his wife, Bertha Johnson ("Bertha"), at the couple's residence on Lockbourne Road in Franklin County, Ohio. Bertha, who was also known as Beth, died as a result of injuries sustained during the stabbing.
 {¶ 3} By an indictment filed on September 23, 2004, defendant was charged with one count of aggravated murder and one count of murder. Defendant pled not guilty to *Page 2 
these charges. A jury trial was later held. After the state presented its case-in-chief, defendant moved for acquittal under Crim.R. 29 as to both charges in the indictment, and the trial court denied this motion. The defense then rested and defendant renewed his Crim.R. 29 motion. The trial court also denied defendant's renewed motion for acquittal.
 {¶ 4} After deliberating, a jury returned verdicts of guilty as to both charges in the indictment. After merging defendant's murder conviction with defendant's conviction for aggravated murder for purposes of sentencing, the trial court imposed a sentence of 20 years to life. At the sentencing hearing, defendant moved for dismissal of his aggravated murder conviction due to a lack of sufficient evidence of prior calculation and design. The trial court denied defendant's motion for dismissal.
 {¶ 5} From the trial court's judgment, defendant appeals. Defendant assigns two errors for our consideration:
 First Assignment of Error
 Appellant's conviction for aggravated murder is not supported by sufficient evidence.
 Second Assignment of Error
 Appellant's conviction is against the manifest weight of the evidence.
 {¶ 6} Because defendant's assignments of error are interrelated, we shall jointly consider them. In his assignments of error, defendant essentially asserts that the state's evidence cannot properly support convictions for aggravated murder and murder. Rather, according to defendant, the state's evidence properly supports a conviction of voluntary manslaughter, as defendant purportedly knowingly acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious *Page 3 
provocation by Bertha that was reasonably sufficient to incite defendant into using deadly force.
 {¶ 7} Defendant's first assignment of error only challenges the sufficiency of the evidence as to defendant's aggravated murder conviction. Defendant's first assignment of error does not, however, challenge the sufficiency of the evidence as to defendant's murder conviction. Accordingly, in resolving defendant's first assignment of error, we shall only address defendant's claim that his aggravated murder conviction is supported by legally insufficient evidence.[1]
See, generally, App.R. 12(A)(2) and 16(A)(7); see, also, Toledo's GreatEastern Shoppers City, Inc. v. Abde's Black Angus Steak House No. III,Inc. (1986), 24 Ohio St.3d 198, 202, citing former App.R. 12(A); C.Miller Chevrolet v. Willoughby Hills (1974), 38 Ohio St.2d 298, 301
(observing that "[i]t is certainly true * * * that in reviewing the judgment of a lower court, a court of appeals need only pass upon errors assigned and briefed; errors not specifically raised may be disregarded").
 {¶ 8} When an appellant challenges his or her conviction as not supported by sufficient evidence, an appellate court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds in State v. Smith (1997),80 Ohio St.3d 89; State v. Thompkins (1997), 78 Ohio St.3d 380, 386,1997-Ohio-52, reconsideration denied, 79 Ohio St.3d 1451; State v.Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. In a sufficiency-of-the-evidence review, an appellate court does not engage in a determination of witness credibility; *Page 4 
rather, it essentially assumes the state's witnesses testified truthfully and determines whether or not that testimony satisfies each element of the crime. State v. Woodward, Franklin App. No. 03AP-398,2004-Ohio-4418, at ¶ 16, cause dismissed, 103 Ohio St.3d 1489,2004-Ohio-5606, reconsideration denied, 104 Ohio St.3d 1428,2004-Ohio-6585.
 {¶ 9} Division (A) of R.C. 2903.01, aggravated murder, provides in part that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." R.C. 2903.01(F) provides that "[w]hoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code." See, also, R.C. 2929.02 (penalties for murder).
 {¶ 10} According to R.C. 2901.22(A), "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 11} However, notwithstanding the statutory language of R.C.2903.01(A), "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of `prior calculation and design.'" State v. Taylor (1997), 78 Ohio St.3d 15, 20,1997-Ohio-243, certiorari denied, 522 U.S. 851, 118 S.Ct. 143. Rather, "each case turns on the particular facts and evidence presented at trial." Id.
 {¶ 12} Because each case involving a charge of aggravated murder turns on the particular facts and evidence presented at trial,Taylor, at 20, "[o]f necessity, a reviewing court must examine the record before it when considering [the presence or absence of "prior calculation and design"]." State v. Goodwin (1999), 84 Ohio St.3d 331,344, 1999-Ohio-356, reconsideration denied, 85 Ohio St.3d 1410, certiorari denied, 528 U.S. 846, 120 S.Ct. 118. "There are no hard and fast factors to be applied to each case. Nor is *Page 5 
there a precise formula to be used when considering those facts. Rather, a case-by-case method must be employed." Id. at 344.
 {¶ 13} In 1974, the General Assembly replaced the more traditional "deliberate and premeditated malice" standard that was formerly an element of aggravated murder with the standard of "prior calculation and design." State v. Trewartha, 165 Ohio App.3d 91, 2005-Ohio-5697, appeal not allowed (2006), 108 Ohio St.3d 1475, 2006-Ohio-665, and appeal not allowed (2006), 110 Ohio St.3d 1413, 2006-Ohio-3306, at ¶ 17, citingState v. Cotton (1978), 56 Ohio St.2d 8, 11.
 {¶ 14} In Trewartha, this court stated:
 * * * Under the ["deliberate and premeditated malice"] standard, "a killing could be premeditated even though conceived and executed on the spur of the moment." [State v. Cotton
(1978), 56 Ohio St.2d 8, 11.] "Prior calculation and design," however, is a more stringent standard. Id. It continues to "embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary." [Taylor, supra, at 19.] Rather than instantaneous deliberation, prior calculation and design requires a scheme designed to implement the calculated design to kill. Cotton, at 11, 10 O.O.3d 4, 381 N.E.2d 190. "Prior calculation and design requires `some kind of studied analysis with its object being the means by which to kill.'" State v. Ellenwood (Sept. 16, 1999), Franklin App. No. 98AP-978, 1999 WL 717998, quoting State v. Jenkins (1976), 48 Ohio App.2d 99, 102, 335 N.E.2d 825.
Id. at ¶ 17. See, also, State v. Conway, 108 Ohio St.3d 214,2006-Ohio-791, motion to reopen denied, 110 Ohio St.3d 1461,2006-Ohio-4288, certiorari denied, ___ U.S. ___, 127 S.Ct. 122, at ¶ 38-39; State v. Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751, reconsideration denied, 96 Ohio St.3d 1517, 2002-Ohio-4950, certiorari denied (2003), *Page 6 537 U.S. 1235, 123 S.Ct. 1359, at ¶ 79; State v. Coley (2001),93 Ohio St.3d 253, 263; R.C. 2903.01, Comments, Legislative Service Commission (1973).[2]
 {¶ 15} In Trewartha, this court explained that "[w]hile the Ohio Supreme Court has declined to uphold findings of prior calculation and design in `explosive, short-duration situations,' the court nonetheless has upheld some `short-lived emotional situations' that do not fit the classic mold of a `planned, cold-blooded killing.'" Id. at ¶ 18, quotingTaylor, 78 Ohio St.3d, at 19-20; see, also, Coley, supra, at 264.[3]
 {¶ 16} Thus, "`[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.'" Trewartha, at ¶ 18, quotingCotton, at paragraph three of the syllabus. See, also, State v.Gover, Franklin App. No. 05AP-1034, 2006-Ohio-4338, at ¶ 13. *Page 7 
 {¶ 17} Accordingly, to sustain defendant's aggravated murder conviction, the state had the burden of proving beyond a reasonable doubt that, under the facts and circumstances of this case, defendant had sufficient time and opportunity to plan Bertha's death, and that, under the surrounding circumstances, defendant had a scheme designed to implement a calculated decision to kill Bertha. See, Trewartha, at ¶ 18, quoting Cotton, at paragraph three of the syllabus.
 {¶ 18} According to the state's evidence, on September 14, 2003, after noticing an unusual happening, Ms. Sheila Null, who at that time owned an automotive shop with her husband on Lockbourne Road, called 911 regarding a possible stabbing at defendant's residence, which was across the street from the automotive shop. (Tr. Vol. II, 37, 40-42.) At trial, Ms. Null testified:
 I was sitting at the desk and I thought I had heard someone screaming oh, my God, oh my God several times and I wasn't sure what it was. And it stopped and I thought we heard stuff all of the time that was a busy street. And then I heard it again and then like a gurgling sound with it. So I got up and walked out into the lot at the shop to look around. * * *
(Tr. Vol. II, 37.)
 {¶ 19} Ms. Null also testified that at first she thought it was a child's voice, but after the second time she heard the scream, she thought it was a woman's voice. Id. When she glanced across the street, Ms. Null saw defendant "coming out of his house standing on the steps of his porch. He stopped and looked around, then came down off of the steps and got into his vehicle and left." (Tr. Vol. II, 37-38.) Defendant drove away in "a small body black pickup truck." (Tr. Vol. II, 38.)
 {¶ 20} After watching defendant leave, Ms. Null told her husband what she thought she had heard. Id. According to Ms. Null, she made a terrible joking comment suggesting *Page 8 
that defendant had just killed his wife. (Tr. Vol. II, 38, 53-54.) According to Ms. Null, she made this comment "[b]ecause I had known that they had had problems previously and we had heard them argue a few times. We could hear them." (Tr. Vol. II, 39, 52.)
 {¶ 21} At some point, Ms. Null called 911 after "a gentleman came running across the street yelling for us to call 911, that [defendant's] wife was laying on the floor and she wasn't moving * * * I grabbed the phone and ran, was running across the street calling them." (Tr. Vol. II, 39.) Ms. Null later learned that the "gentleman" that ran across the street was defendant's brother, Cliff. (Tr. Vol. II, 43, 59-60.) According to Ms. Null, before she called 911, she saw defendant briefly return to the residence and then leave again. Ms. Null testified: "He came back — first he left and came back about ten minutes later and left. He was only there like a minute and left again." (Tr. Vol. II, 44.)
 {¶ 22} After arriving at the porch of defendant's house, Ms. Null and her husband unsuccessfully attempted to find Bertha's pulse. (Tr. Vol. II, 43.) While she was on the porch, Ms. Null also saw a knife near Bertha. (Tr. Vol. II, 44.)
 {¶ 23} Shortly thereafter, at approximately 6 p.m., firefighters and police officers responded to an emergency call regarding a possible stabbing at defendant's residence. (Tr. Vol. II, 6, 44, 60, 134.) After waiting for police officers to secure the scene, a paramedic approached the front porch where he observed Bertha lying on the porch with a bloodstained knife near her. (Tr. Vol. II, 7, 11, 13.) While at the scene, a police officer moved the knife that was near Bertha to: (1) allow paramedics to begin treatment of Bertha; (2) prevent injury to the emergency medical staff while they were treating Bertha; and (3) prevent any disturbing of the evidence through inadvertent bumping or stepping on the evidence by emergency medical personnel. (Tr. Vol. II, 27-28.) *Page 9 
 {¶ 24} According to a paramedic, when he saw Bertha, she appeared dead and there was "some moderate blood loss from her neck area and a little bit from her back area." (Tr. Vol. II, 8.) This paramedic checked Bertha's vital signs and found that she was not breathing, she had no pulse, and her pupils were fixed and dilated. Id. Bertha's body showed evidence of cyanosis and her body showed no signs of life. Id. There was also evidence of two stab wounds — one to the neck and one to the back. (Tr. Vol. II, 11-12.) An EMS supervisor at the time confirmed that Bertha had suffered injuries that were incompatible with life. (Tr. Vol. II, 18.)
 {¶ 25} According to a police officer with the crime scene search unit, besides finding a knife in the area of the porch, police officers also found two cigarette lighters and a pack of cigarettes. (Tr. Vol. II, 86-87.) Photographs of the crime scene were taken, including a picture of a shoe print around blood next to Bertha; a sketch of the crime scene was made; and a bloodied knife was collected as evidence. (Tr. Vol. II, 65-66, 78, 83.) However, no fingerprints at the crime scene were taken. (Tr. Vol. II, 86, 94-95.) Pictures of Bertha were taken at the morgue and her clothing also was collected at the morgue. (Tr. Vol. II, 78-80).
 {¶ 26} On the evening of September 14, 2004, after a police detective informed an undercover deputy sheriff that defendant was a suspect in the stabbing of Bertha, this undercover deputy sheriff began to search for defendant and later found him. (Tr. Vol. II, 98-99, 101-102.) According to the undercover deputy sheriff, "[t]he first statement [defendant] made to me was is she dead or words to that effect. And she's dead, isn't she or words to that effect. I can't say exactly, but that's words to that effect. I said I wasn't — I didn't know yet. And the best thing you could do is cooperate, which he did. *Page 10 
He was crying, shaking." (Tr. Vol. II, 99.) Later defendant was taken into custody. (Tr. Vol. II, 99-100.)
 {¶ 27} Following his arrest, defendant was taken to police headquarters, where detectives interviewed defendant after informing him of his Miranda rights.[4] (Tr. Vol. II, 142.) During the interview defendant inquired whether his wife was dead. (Tr. Vol. II, 145.) When asked about the events of September 14, 2004, defendant told the detectives:
 She's just been staying on me, staying on me. She left me for some crack head and I let her stay under the roof. And I told her just stay off of me. She just kept on me for the last three days and I asked her, I said I signed the truck over to her. I told her just leave and take your stuff. I can't take it. She got on me out front. That's all I remember. I don't remember getting the —
 * * *
 I remember being in the house and I walked out and seen her laying there.
 * * * All I remember is being out there and she kept on getting on me and then I didn't remember anything until I was walked back out and seen her laying [sic] there.
(Tr. Vol. II, 145-146.)
 {¶ 28} Defendant informed the detectives that earlier that day he and Bertha argued on the front porch and that they were the only two persons on the porch during the argument. (Tr. Vol. II, 147-148.) Defendant also informed detectives that he had no specific recollection as to how long Bertha was lying on the porch. (Tr. Vol. II, 149.) *Page 11 
Although defendant stated he thought that he and Bertha argued at some point in the afternoon, he could not recall a specific time that the argument occurred. Id. Defendant also did not recall eating lunch or dinner that day. (Tr. Vol. II, 149-150.) At one point during the interview, a detective inquired as follows:
 DETECTIVE GOSS: So you just remember sitting on the chair, you go outside. What was the purpose in going outside?
 [DEFENDANT]: I just walked out. She was laying there and I seen the knife and I knew it was one of ours and I knew what had happened.
 DETECTIVE GOSS: What had happened?
 [DEFENDANT]: It would have had to been me.
 DETECTIVE GOSS: Where did the knife — where would the knife have come from?
 [DEFENDANT]: Kitchen.
 DETECTIVE GOSS: It's a kitchen knife?
 [DEFENDANT]: Yeah.
(Tr. Vol. II, 150.)
 {¶ 29} Detective Goss inquired further:
 DETECTIVE GOSS: Do you remember getting the knife?
 [DEFENDANT]: No. I don't remember anything until I come to, like come to in the chair and I walked out front. I kind of looked over.
 DETECTIVE GOSS: Did you have the knife when you guys were out there arguing?
 [DEFENDANT]: No. I don't think so.
 DETECTIVE GOSS: So at some point you had to walk in and get it then. *Page 12 
 [DEFENDANT]: Yeah.
 DETECTIVE GOSS: Do you remember walking in the house toward the kitchen?
 [DEFENDANT]: I don't — the last thing I remember is standing there on the porch.
(Tr. Vol. II, 151-152.)
 {¶ 30} Defendant then informed detectives that he called 911 using a cell phone. (Tr. Vol. II, 152.) Defendant told detectives that, after he called 911, "I just drove and then ended up walking." (Tr. Vol. II, 153.) Defendant informed detectives that he had been married to Bertha for 14 years (Tr. Vol. II, 154), and that he would typically leave the house when he and Bertha fought in the past. (Tr. Vol. II, 155.) At one point, defendant stated: "I wish I'd have just left and not come back." Id.
 {¶ 31} During the interview, Detective Goss inquired:
 DETECTIVE GOSS: We're trying to help you here, Mr. Johnson. You know, what would provoke you to do that? It had to be something more than normal. I mean, she say something that hit below the belt that she never went before?
 [DEFENDANT]: I don't know.
Id.
 {¶ 32} Another detective, Detective Eppert, inquired as follows:
 DETECTIVE EPPERT: Have you felt yourself during these last few months other than hurting yourself, is she putting you in that position where you just — I know you said sometimes you walk away, a lot of times you'll walk away, but she just keeps pushing and pushing and finally you just kind of lose it and you're in that fit of rage. Is that how you felt today? I mean sometimes —
 [DEFENDANT]: I don't even know what she said.
 DETECTIVE EPPERT: You can't remember what it was that pushed you over the edge? *Page 13 
 [DEFENDANT]: No.
(Tr. Vol. II, 156-157.)
 {¶ 33} Defendant told detectives that Bertha "said something" about taking their daughter and leaving the home. (Tr. Vol. II, 157.) When Detective Eppert inquired whether that could have sent defendant "overboard," defendant answered: "I don't know. That's about the last thing I remember." (Tr. Vol. II, 158.) Detective Eppert further inquired:
 DETECTIVE EPPERT: So it's possibly her threatening to take your daughter away from you is what put you over the edge today?
 [DEFENDANT]: It could have been.
 DETECTIVE EPPERT: And unable to walk away.
 [DEFENDANT]: It could have been.
Id.
 {¶ 34} At another point in the interview, Detective Goss inquired as follows:
 DETECTIVE GOSS: What my partner is trying to do for you here, Mr. Johnson, we need to know if you guys are arguing or, you know, in the heat of the battle and, you know, boom, you know, she pushes you as far as you can go and you snap and this happens or, you know, are you planning this?
 [DEFENDANT]: No. I would never kill anybody. I did not want her dead.
 DETECTIVE EPPERT: I think your demeanor right now tells us that. You're upset about this. We're trying to understand.
 DETECTIVE GOSS: We're trying to help your memory here so we can find out what happened.
 DETECTIVE EPPERT: Are you doing it in a fit of rage and did she threaten you to take your child away and that pushed you over the edge? *Page 14 
 [DEFENDANT]: I remember her saying that and that's all I remember.
(Tr. Vol. II, 159-160.)
 {¶ 35} During the interview, Detective Goss also inquired as follows:
 DETECTIVE GOSS: Let me ask you this and this is important. I need you to really think back. Did it happen on the porch or could it have happened inside?
 [DEFENDANT]: I don't think it would have happened inside.
 DETECTIVE GOSS: You think it would have happened right there on the front porch?
 [DEFENDANT]: That's where she was at.
 DETECTIVE GOSS: You don't remember moving her or anything after the fact?
 [DEFENDANT]: No.
 DETECTIVE GOSS: You think you would remember that?
 [DEFENDANT]: I wouldn't see any reason to.
(Tr. Vol. II, 161-162.)
 {¶ 36} When asked where in the kitchen the knife would have been kept, defendant answered that "[i]t could have been laying [sic] anywhere." (Tr. Vol. II, 160.) Defendant denied remembering that he carried the knife outside. (Tr. Vol. II, 161.) According to defendant, he remembered arguing with Bertha, sitting in a chair in the living room of the house, walking out the front door, and calling 911. (Tr. Vol. II, 167.) Defendant also denied calling his brother, Cliff, and denied going to Cliff's house after the stabbing. (Tr. Vol. II, 162.)
 {¶ 37} At trial, Detective Goss, the primary detective of the case, testified that during his investigation he obtained two audio recordings of 911 calls related to the case. *Page 15 
(Tr. Vol. II, 133, 169.) According to Detective Goss, one of the phone calls was from Ms. Null and the other phone call was from an unidentified male caller. (Tr. Vol. II, 170.) Both telephone calls were received within minutes of the other. (Tr. Vol. II, 171.) Detective Goss also testified that Detective Eppert's suggestion to defendant about a "fit of rage" was an interview technique that was used "to minimize the severity of the crime to the person we're interviewing to soften them up and just minimize the crime so they'll feel more compelled to talk to us about it. It's a technique we use frequently. Sometimes it works, sometimes it doesn't." (Tr. Vol. II, 174.) Detective Goss further testified that the use of such a technique did not "necessarily mean that that's how you think things happen[.]" Id.
 {¶ 38} Detective Goss confirmed that a knife was recovered at the scene but no fingerprints were retrieved from the knife (Tr. Vol. II, 177.) The parties also later stipulated that if another police detective were called to testify, this detective would testify that there were no fingerprints of value obtained from the knife. (Tr. Vol. III, 45.) The parties also stipulated and agreed that the woman found at defendant's residence and later examined by a deputy coroner was Bertha. Id.
 {¶ 39} On cross-examination, Detective Goss testified that during the investigation he "developed" information that Bertha had a boyfriend who was incarcerated; that Bertha and this boyfriend corresponded by letter; that the "tenor" of these letters between Bertha and her boyfriend were from one lover to another; and that Bertha had planned to leave defendant and take their daughter, the child of defendant and Bertha, with her when she left defendant. (Tr. Vol. II, 202-204, 206, 208.)
 {¶ 40} Detective Goss testified that he did not direct members of the crime scene search unit to "process" defendant's truck for evidence after the truck had been located, *Page 16 
and that no tread patterns were taken from the footprint on the porch to determine if this footprint matched the footprint of any particular person. (Tr. Vol. II, 209, 212.) When Detective Goss was asked whether such a tread print would be important in determining beyond a reasonable doubt who was at the crime scene after Bertha bled, Detective Goss answered, "I believe I was told it was a medic footprint[,] and that was "good enough" for him. (Tr. Vol. II, 213.)
 {¶ 41} On September 15, 2004, an autopsy of Bertha's body was performed. (Tr. Vol. II, 111.) According to the former deputy coroner who performed the autopsy, an external examination of the body revealed sharp instrument wounds to the left neck and left back area, and superficial abrasions to her abdomen, arm, and forearm that could have occurred after Bertha sustained the sharp instrument wounds. (Tr. Vol. II, 112-113.) According to him, the sharp instrument wound to the neck created a defect in the postoropharynx or the back part of the voice box, but this injury was not fatal. (Tr. Vol. II, 113.) Rather, the sharp instrument wound to Bertha's left back was the fatal injury as it pierced her left lung and her thoracic aorta, which caused bleeding into her left chest cavity, which led to her death. (Tr. Vol. II, 113-114.) Also, according to him, Bertha's sharp instrument wounds were consistent with a stabbing from the knife that was recovered from the porch of Bertha's residence. (Tr. Vol. II, 115-116.)
 {¶ 42} A toxicology analysis of the blood from Bertha's body showed the presence of alcohol; pseudoephedrine, a common component of cold medicines; diphenhydramine, an antihistamine which is found in over-the-counter medicine; methylphenidate or Ritalin, which in adults is used in the treatment of attention deficit disorders and narcolepsy; and diazepam or Valium, an anti-anxiety agent. (Tr. Vol. II, 117-118.) He further testified that "nordiazepam", a metabolite of diazepam, was present in Bertha's blood, which probably *Page 17 
indicated that she was a chronic user of diazepam "for at least a week or so before she died." (Tr. Vol. II, 118, 126, 127.) He testified that he did not believe these drugs had anything to do with Bertha's death. (Tr. Vol. II, 120.) According to him, there was also the presence of pulmonary emphysema, which he testified was probably related to smoking. (Tr. Vol. II, 123.) He also testified that abnormalities in Bertha's liver indicated that she may have been exposed to some type of hepatitis or may have abused drugs. (Tr. Vol. II, 124-125.) An examination of Bertha's kidneys also showed the presence of acute chronic pyelonephritis, or acute chronic kidney inflammation. (Tr. Vol. II, 125.)
 {¶ 43} Besides calling law enforcement officers, emergency medical personnel, and a former deputy coroner as witnesses, the state also called C.J.,[5] the 13-year-old daughter of defendant and Bertha, to testify on behalf of the state. C.J. testified that about one to two weeks before her mother died, her parents had an argument concerning with whom she should live. (Tr. Vol. III, 11, 14-15). C.J. testified: "They just argued about it in front of me and one time we were setting down and he told me that I should live with him because he's the one with me when my mom left. * * * I should live with him because he took care of me when my mom left." (Tr. Vol. III, 15.) C.J. further testified that the day before her mother died, defendant and her mother "argued a little bit probably." (Tr. Vol. III, 16.)
 {¶ 44} On cross-examination, C.J. testified that in the "beginning of 2004" her mother went to a "rehab center" because she was "doing drugs." (Tr. Vol. III, 35.) According to C.J., while her mother was at the rehabilitation center, her mother met Scott *Page 18 
Gray. (Tr. Vol. III, 36.) According to C.J., she first heard her parents argue about Scott Gray during the summer of 2004, and later her mother left the home. (Tr. Vol. III, 37.) On re-direct examination, C.J. also testified that her parents also argued more often when defendant was drinking. (Tr. Vol. III, 44.)
 {¶ 45} According to C.J., on the day that her mother died, her mother took C.J. and a friend of C.J. to the library. However, before Bertha took C.J. and C.J.'s friend to the library, defendant and Bertha argued about Bertha's boyfriend's identification card or driver's license, which defendant had discovered and which defendant would not give to Bertha. (Tr. Vol. III, 17.) After the trip to the library, Bertha allowed C.J. to stay at her friend's house to play. (Tr. Vol. III, 19.) According to C.J., after leaving C.J.'s friend's house, her mother planned to return home. Id.
 {¶ 46} C.J. testified that she remained at her friend's house until defendant picked her up "right before dinnertime probably." (Tr. Vol. III, 20.) C.J. testified that at the time that defendant picked her up, her 14-year-old cousin was also in the truck. Id. When asked whether defendant said anything to her when she was in the truck with him, C.J. testified: "That he was just taking my mom out to dinner and I wanted to see her but he said because she was in the shower so he took me to my Aunt Lynn's and my Aunt Vicki's house." Id. According to C.J., while she was at her Aunt Lynn's house that evening, without explanation, she was not allowed to watch the news that was broadcast at dinnertime. (Tr. Vol. III, 22.)
 {¶ 47} On cross-examination, when asked if she had been prescribed Ritalin, C.J. answered affirmatively and testified that she had been prescribed this medication since she was in the third grade for treatment of "ADHD." (Tr. Vol. III, 23-24.) When asked if she knew if her mother had ever taken her medicine, C.J. testified: "I don't think. I don't *Page 19 
know." (Tr. Vol. III, 24.) C.J. testified that on occasion her mother took her father's pain pills. (Tr. Vol. III, 41.) When asked about her mother's boyfriend, C.J. testified that she had never met him. (Tr. Vol. III, 25-26.) However, C.J. testified that she had seen her mother write letters to this boyfriend. (Tr. Vol. III, 26-27.) C.J. also confirmed that before her mother died, defendant had a history of attempting to hurt himself by "splitting] [sic] his wrists," (Tr. Vol. III, 28), and that her father also had overdosed on prescription "pain pills." (Tr. Vol. III, 41.)
 {¶ 48} The crux of defendant's claim that his aggravated murder conviction is supported by legally insufficient evidence concerns whether there is sufficient evidence to support a finding that defendant killed Bertha with "prior calculation and design." In resolving defendant's claim, we must determine whether the state produced direct or circumstantial evidence that defendant had a preconceived plan leading up to the murder of Bertha, and we must also determine whether the state produced direct or circumstantial evidence that defendant killed Bertha in conformity with such a preconceived plan.
 {¶ 49} Here, the state adduced no direct evidence that defendant had a preconceived plan leading up to the murder of Bertha, or that defendant acted in conformity with such a preconceived plan. See, generally, Black's Law Dictionary (8 Ed.Rev.2004) 596 (defining "direct evidence" as, among other things, "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption"). Absent direct evidence that defendant had a preconceived plan leading up to the murder of Bertha or that defendant acted in conformity with such a preconceived plan, the jury was left with circumstantial evidence to determine whether *Page 20 
defendant had a preconceived plan leading up to the murder of Bertha and whether defendant acted in conformity with such a plan.
 {¶ 50} In State v. Calderon, Franklin App. No. 05AP-1151,2007-Ohio-377, this court discussed circumstantial evidence and its probative value as follows:
 * * * "Circumstantial evidence is the `proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'" State v. Heny, Franklin App. No. 04AP-1061, 2005-Ohio-3931, at ¶ 33, appeal not allowed, 107 Ohio St.3d 1699, 2005-Ohio-6763, quoting State v. Bentz (1981), 2 Ohio App.3d 352, 355, fn. 6, citing 1 Ohio Jury Instructions (1968), Section 5.10(d). Moreover, "[circumstantial evidence has probative value equal to that of direct evidence." Henry, at ¶ 33, citing [State v. Nicely (1988), 39 Ohio St.3d 147, 151]. "`[Individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'" Henry, at ¶ 33, quoting Bourjaily v. United States (1987), 483 U.S. 171, 179-180, 107 S.Ct. 2775.
Id. at ¶ 25. See, also, State v. Griesheimer, Franklin App. No. 05AP-1039, 2007-Ohio-837, at ¶ 26.
 {¶ 51} In the instant case, because the state adduced no direct evidence that defendant had adopted a plan to kill Bertha by stabbing or retrieved a knife from the house in conformity with a preconceived plan to kill her by stabbing, whether he adopted a plan to kill her by stabbing or retrieved a knife from the house in conformity with a preconceived plan admittedly is subject to some measure of conjecture. The presence of some measure of conjecture, however, does not by itself show that an inference that defendant adopted a plan to kill Bertha by stabbing or that he acted in conformity with such a plan is impermissible. In Lavender v. Kurn (1946), 327 U.S. 645, 66 S.Ct. 740, the Supreme Court of the United States stated: *Page 21 
 * * * Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where * * * there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.
Id. at 653.
 {¶ 52} Therefore, for purposes of our appellate review, whether this court would draw the same or contrary inferences from the direct evidence than those drawn by the jury is not a proper focal point of our review. Id. Rather, our proper focal point is the reasonableness of the inference or inferences drawn by the jury. See, e.g., Gallick v.Baltimore Ohio RR. Co. (1963), 372 U.S. 108, 115, 83 S.Ct. 659, wherein the Supreme Court of the United States stated:
 "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." * * * *Page 22 
Id. at 114-115, quoting Tennant v. Peoria P.U. Ry. Co. (1944),321 U.S. 29, 35, 64 S.Ct. 409, rehearing denied, 321 U.S. 802, 64 S.Ct. 409. (Citations omitted.) See, also, Hurt v. Charles J. Rogers Transp.Co. (1955), 164 Ohio St. 329, paragraph four of the syllabus (holding that "[t]he weight of an inference as well as the weight of the explanation offered to meet the inference is for the determination of the trier of facts, unless the explanation is such that reasonable minds could not reach different conclusions as to its preponderating value when measured against the weight of the circumstantial evidence").
 {¶ 53} Consequently, after construing the evidence and reasonable inferences drawn from this evidence in favor of the state, when determining whether the state's evidence permits any rational trier of fact to find the essential elements of aggravated murder beyond a reasonable doubt, we must also consider the reasonableness of a particular inference or conclusion drawn by the jury. SeeGallick, at 114-115.
 {¶ 54} Here, the state adduced evidence, which if believed by the jury, established that: (1 ) on September 14, 2004, defendant and his wife, Bertha, fought on the front porch of their house; (2) when they began to fight, a knife was not on the porch; (3) there were no other persons on the porch when they fought; (4) the fight between them apparently did not spill over into the house; (5) Bertha sustained a sharp instrument wound to her neck and a sharp instrument wound to her back; (6) Bertha died as a proximate result of the sharp instrument wound to her back; (7) a bloodied knife was near Bertha's body on the porch; (8) this bloodied knife belonged to defendant and Bertha and would have been used in the kitchen; (9) the wounds that Bertha sustained were not inconsistent with wounds that the knife that was found next to her body would inflict if it were used in the stabbing; (10) defendant left the residence where Bertha's body was found shortly after a *Page 23 
neighbor heard screaming and later briefly returned to the residence and left again; (11) even though defendant claims to have called 911, he left the scene before emergency personnel responded to the scene; and (12) around "dinnertime" on that evening, defendant picked up his daughter from her friend's house and drove her to a relative's house, where the daughter was prevented from watching the news on television.
 {¶ 55} From this evidence and reasonable inferences drawn therefrom, we conclude that a jury reasonably could conclude that defendant was the perpetrator of the crimes as charged in the indictment. See, generally,State v. Williams (1997), 79 Ohio St.3d 1, 11, 1997-Ohio-407, certiorari denied (1998), 522 U.S. 1033, 118 S.Ct. 703, quoting State v. Eaton
(1969), 19 Ohio St.2d 145, 160, vacated on other grounds (1972),408 U.S. 935, 92 S.Ct. 2857, quoting 2 Wigmore, Evidence (3 Ed.) 111, Section 276 (stating that [i]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself"'").
 {¶ 56} Furthermore, from the videotaped police interview of defendant that was shown in open court in which the defendant did not appear to have any obvious injuries, a jury also could reasonably infer that defendant did not sustain any defensive wounds during the fight with his Bertha. This, along with the fact that Bertha was fatally injured by a wound that was consistent with a stabbing by a knife, we find a jury reasonably could conclude that defendant, rather than Bertha, retrieved the knife from the house and was the aggressor during that portion of the fight when the knife was used. See, generally, Hurt, supra, at paragraph two of the syllabus (holding that "[a]n inference which is based *Page 24 
in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in by a jury").
 {¶ 57} Based upon our review of the evidence and reasonable inferences drawn therefrom, we also find that the state's evidence supports a finding that defendant acted with a purpose to kill. In State v.Burke (1995), 73 Ohio St.3d 399, certiorari denied (1996),517 U.S. 1112, 116 S.Ct. 1336, the Supreme Court of Ohio stated:
 * * * Intent need not be proven by direct testimony. State v. Lott (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293, 302. Instead, an intent to kill "may be deduced from the surrounding circumstances, including the instrument used, its tendency to destroy life if designed for that purpose, and the manner of inflicting the wound." State v. Robinson (1954), 161 Ohio St. 213, 218-219, 53 O.O. 96, 99, 118 N.E.2d 517, 521.
Id. at 404. See, also, Calderon, supra, at ¶ 24-25.
 {¶ 58} Here, because defendant used a knife and stabbed Bertha in the neck and back, rather than superficially stabbing her in a non-vital area of the body, such as an extremity, a jury reasonably could deduce that defendant intended to kill her.[6]
 {¶ 59} The issue remains, however, whether there is sufficient evidence that defendant committed aggravated murder by stabbing Bertha in conformity with a preconceived plan as required by R.C. 2903.01(A).
 {¶ 60} In Trewartha, this court previously stated: *Page 25 
 The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways: (1) evidence of a preconceived plan leading up to the murder, (2) evidence of the perpetrator's encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill * * * or (3) evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill. See, e.g., State v. Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81; Goodwin, 84 Ohio St.3d 331, 703 N.E.2d 1251; State v. Campbell (2000), 90 Ohio St.3d 320, 738 N.E.2d 1178.
Id. at ¶ 19.
 {¶ 61} Here, construing the evidence and reasonable inferences drawn therefrom in favor of the prosecution, the facts are sufficient to show that defendant adopted a plan to kill Bertha by stabbing. According to defendant's statements to police detectives, the fight between defendant and Bertha began on the front porch. When the fight began, there was no knife on the porch. Defendant informed detectives that he did not recall whether the fight that began on the porch spilled over into the house. Therefore, defendant appears to have had no reason to be in the house, except for the purpose of retrieving a knife, which, as discussed above, was used by defendant to purposely kill Bertha. See, generally,Hurt, supra, at paragraph two of the syllabus. Under facts and circumstances such as these, we find that a jury reasonably could conclude that defendant had a preconceived plan to stab Bertha and that he acted in conformity with his preconceived plan. See, e.g., State v.Robbins (1979), 58 Ohio St.2d 74 (finding sufficient evidence supported a jury's finding of "prior calculation and design" after the *Page 26 
defendant returned to his apartment to secure a weapon which he used to stab the victim).
 {¶ 62} Moreover, because "[p]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes," Coley, supra, at 264, whether defendant quickly conceived and executed his plan to stab Bertha or whether he conceived and executed his plan to stab her after protracted deliberation is immaterial under the facts and circumstances of this case. Here, absent any evidence that defendant's stabbing of Bertha was the result of instantaneous deliberation, construing the evidence and reasonable inferences drawn therefrom in favor of the state, the jury reasonably could infer that defendant's scheme to stab Bertha was the result of some studied analysis. See Trewartha, at ¶ 17, quoting State v.Ellenwood (Sept. 16, 1999), Franklin App. No. 98AP-978, quotingJenkins, supra, at 102.
 {¶ 63} Accordingly, construing the evidence and reasonable inferences drawn therefrom in favor of the state, and assuming the state's witnesses testified truthfully, see Jenks, supra, at paragraph two of the syllabus and Woodward, supra, at ¶ 16, we conclude that sufficient evidence supports a finding that under the facts and circumstances of this case, defendant had sufficient time and opportunity to plan Bertha's death, and that, under the surrounding circumstances, he had a scheme designed to implement a calculated decision to kill Bertha by stabbing, thereby committing the crime of aggravated murder. We therefore hold that legally sufficient evidence supports defendant's conviction for aggravated murder. We therefore overrule defendant's first assignment of error.
 {¶ 64} Defendant also claims that his aggravated murder conviction and murder conviction are against the manifest weight of the evidence. *Page 27 
 {¶ 65} When presented with a manifest-weight argument, an appellate court engages in a limited weighing of the evidence to determine whether the fact finder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. Thompkins, at 387; Conley, supra; State v. Group,98 Ohio St.3d 248, 2002-Ohio-7247, at ¶ 77. "The question for the reviewing court [in a manifest-weight claim] is `whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" Id. at ¶ 77, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175. See, also, Thompkins, at 387; id. at paragraph four of the syllabus (construing and applying Section 3[B][3], Article IV, Ohio Constitution) (holding that "[t]o reverse a judgment of the trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required").
 {¶ 66} Division (A) of R.C. 2903.01, aggravated murder, provides in part that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" By comparison, division (A) of R.C. 2903.02, murder, provides in part that "[n]o person shall purposely cause the death of another[.]" Thus, as between aggravated murder under R.C. 2903.01(A) and murder under R.C. 2903.02(A), the only difference between these two crimes is the element of "prior calculation and design." See Goodwin, supra, at 345 (observing that murder under R.C.2903.02 is a lesser-included offense of aggravated murder under R.C.2903.01[A], and the sole difference is that the element of "prior calculation and design" is absent from murder); see, also, State v.Bethel, *Page 28 110 Ohio St.3d 416, 2006-Ohio-4853, at ¶ 136; State v. Monroe,105 Ohio St.3d 384, 2005-Ohio-2282, at ¶ 36.
 {¶ 67} On the trial of a criminal or civil case, a determination of the weight of the evidence and credibility of witnesses is primarily for the trier of facts. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. In Woodward, supra, this court explained:
 * * * [T]he jury is free to believe all, part, or none of the testimony of each witness who appears before it. State v. Long (1998), 127 Ohio App.3d 328, 335. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. State v. Wright, Franklin App. No. 03AP-470, 2004-Ohio-677, at ¶ 11. Thus, a reviewing court may not second guess the jury on matters of weight and credibility. Id.
Id. at ¶ 18. See, also, In re D.F., Franklin App. No. 06AP-1052,2007-Ohio-617, at ¶ 26, fn. 3, quoting Maxton Motors, Inc. v.Schindler (Dec. 26, 1984), Defiance App. No. 4-83-23 (discussing role of the trier of facts).
 {¶ 68} Based on our review of the evidence and reasonable inferences drawn therefrom, we cannot conclude that the jury clearly lost its way when it concluded that defendant purposely caused the death of Bertha. Because defendant used a knife and stabbed Bertha in the neck and back, rather than superficially stabbing her in a non-vital area of the body, a jury reasonably could infer that defendant intended to kill Bertha.
 {¶ 69} Moreover, when the trial court instructed the jury as to the murder charge, it also gave an instruction concerning voluntary manslaughter. (Tr. Vol. II, 136-138.) See, generally, State v.Rhodes (1992), 63 Ohio St.3d 613, rehearing denied, *Page 29 64 Ohio St.3d 1481, at syllabus.[7] Based upon our review of the evidence and reasonable inferences drawn therefrom, we cannot conclude that the jury lost its way when it concluded that defendant failed to prove by a preponderance of the evidence that he knowingly acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation by Bertha that was reasonably sufficient to incite him into using deadly force. When police detectives questioned defendant about his argument with Bertha, defendant remembered that Bertha threatened to take their daughter with her when she left the marital residence, but he was uncertain whether such a threat provoked him or put him "over the edge." (Tr. Vol. II, 157-158.) Because the jury was free to believe all, some, or none of the evidence, including the evidence of defendant's statements to detectives during the police interview, see Woodward, at ¶ 18, we cannot find that the jury clearly lost its way when it apparently gave less weight to defendant's statements concerning a lack of memory as to the events of September 14, 2004.
 {¶ 70} Finally, based on our review of the evidence and reasonable inferences drawn from this evidence, we also cannot conclude that the jury clearly lost its way when it concluded that defendant acted with "prior calculation and design." Here, although individual pieces of circumstantial evidence may have been insufficient in themselves to *Page 30 
prove that defendant acted with "prior calculation and design," the jury reasonably could have concluded that the direct and circumstantial evidence in cumulation proved that defendant acted with "prior calculation and design." See Calderon, supra, at ¶ 25, quotingHenry, supra, at ¶ 33, quoting Bourfaily, supra, at 179-180 (stating that "`[individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts'").
 {¶ 71} Therefore, for the reasons set forth above, we hold that defendant's convictions for aggravated murder and murder are not against the manifest weight of the evidence. We therefore overrule defendant's second assignment of error.
 {¶ 72} For the foregoing reasons, both of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 BRYANT and BOWMAN, JJ., concur.
BOWMAN, J., retired of the Tenth Appellate District, assigned to active duty under the authority of Section 6(C), Article IV, Ohio Constitution.
[1] But, see, fn. 6, infra (concluding that by implication defendant's murder conviction is supported by legally sufficient evidence).
[2] In its comments, the Legislative Service Commission stated:
 The first part of [R.C. 2903.01] restates the former crime of premeditated murder so as to embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary. By judicial interpretation of the former Ohio law, murder could be premeditated even though the fatal plan was conceived and executed on the spur of the moment. * * * [R.C. 2903.01] employs the phrase, "prior calculation and design," to indicate studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves but they must amount to more than momentary deliberation. * * *
[3] In Coley, the Supreme Court of Ohio stated:
 * * * [P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes. See, e.g., State v. Palmer (1997), 80 Ohio St.3d 543, 567-568, 687 N.E.2d 685, 706 (road-rage double homicide that quickly occurred after traffic accident); State v. Taylor, 78 Ohio St.3d at 20-23, 676 N.E.2d at 89-91 (chance encounter in bar between rivals for another's affections).
[4] See, generally, Miranda v. Arizona (1966), 384 U.S. 436, 444,86 S.Ct. 1602, rehearing denied, 385 U.S. 890, 87 S.Ct. 11 (holding that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination"); Dickerson v. UnitedStates (2000), 530 U.S. 428, 444, 120 S.Ct. 2326 (concluding thatMiranda announced a constitutional rule that Congress may not legislatively supersede).
[5] Because the daughter of defendant and Bertha is a minor, to protect this child's anonymity we shall use initials of the child instead of the full name of the child in this opinion. See, e.g.,Ritter v. Ritter, Cuyahoga App. No. 83241, 2004-Ohio-2550, at ¶ 3, fn. 1 (appeal from dismissal of domestic violence action) (using initials of minor children rather than the full name of the children to protect the identity of the minor children).
[6] Although defendant's first assignment of error does not challenge whether his murder conviction under R.C. 2903.02 is supported by legally sufficient evidence, by implication, our conclusion that the state's evidence and reasonable inferences drawn from this evidence support a finding that defendant acted with purpose to kill establishes that defendant's murder conviction is supported by legally sufficient evidence. See, generally, R.C. 2903.02(A) (murder) (providing in part that "[n]o person shall purposely cause the death of another"); see, also, State v. Goodwin (1999), 84 Ohio St.3d 331, 345, 1999-Ohio-356, reconsideration denied, 85 Ohio St.3d 1410, certiorari denied,528 U.S. 846, 120 S.Ct. 118 (observing that murder under R.C. 2903.02 is a lesser-included offense of aggravated murder under R.C. 2903.01[A], and the sole difference is that the element of "prior calculation and design" is absent from murder); State v. Bethel, 110 Ohio St.3d 416,2006-Ohio-4853, at ¶ 136; State v. Monroe, 105 Ohio St.3d 384,2005-Ohio-2282, at ¶ 36.
[7] In Rhodes, the Supreme Court of Ohio held:
 A defendant on trial for murder or aggravated murder bears the burden of persuading the fact finder, by a preponderance of the evidence, that he or she acted under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, R.C. 2903(A), in order for the defendant to be convicted of voluntary manslaughter rather than murder or aggravated murder. * * *
Id. at syllabus, construing and modifying State v. Muscatello (1978),55 Ohio St.2d 201. *Page 1